# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIAN JACOBS, ALAN JACOBS, THE BERNARD B. JACOBS AND SARA JACOBS FAMILY TRUST, JEAN-LOUIS VELAISE, DALE KUTNICK, TOREN KUTNICK, EDWARD B. ROBERTS, JOHN DENNIS, SHLOMO BAKHASH, and JOAN RUBIN, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2021-0346-JTL |
| AKADEMOS, INC., KOHLBERG VENTURES, LLC, BAY AREA HOLDINGS, INC., JOHN EASTBURN, GARY SHAPIRO, JAMES KOHLBERG, RAJ KAJI, BILL YOUSTRA and BURCK SMITH, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## POST-TRIAL OPINION

Date Submitted: July 12, 2024
Date Decided: October 30, 2024

Elizabeth A. Sloan, BALLARD SPAHR LLP, Wilmington, Delaware; Jason C. Spiro, Thomas M. Kenny, Marissa DeAnna, SPIRO, HARRISON & NELSON, Montclair, New Jersey; *Attorneys for Plaintiffs.*

Geoffrey G. Grivner, Kody M. Sparks, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware; *Attorneys for Defendants Akademos, Inc. John Eastburn, Gary Shapiro, James Kohlberg, Raj Kaji, Bill Youstra and Burck Smith.*

Geoffrey G. Grivner, Kody M. Sparks, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware; Gavin J. Rooney, LOWENSTEIN SANDLER LLP, New York, New York; *Attorneys for Defendants Kohlberg Ventures LLC and Bay Area Holdings, Inc.*

**LASTER, V.C.**

A privately held corporation pursued a seemingly promising business model: contract with educational institutions like colleges and universities to operate their online bookstores. Yet during more than two decades of operations, the company failed to produce a single profitable year.

Throughout the company's first decade, the founder bridged the company's annual cash shortfall by raising funds from friends, family, and the occasional angel investor. In return, those investors received common stock.

Around the halfway mark, the company secured an investment from a venture capital fund. The fund received shares of preferred stock that carried a liquidation preference triggered under specified circumstances.

During the company's second decade, the fund made supplemental investments to cover the company's shortfalls. Initially, the fund bought more preferred stock. Later, the fund received promissory notes that carried a repayment premium triggered under specified circumstances.

The company maintained that if it could achieve sufficient scale, then its business model would become profitable. By 2020, the company had not achieved its goals, and the company's low margins cast doubt on whether it ever could. A new CEO proposed starting two new, higher-margin businesses, but the company needed at least $2 million to continue operating its core business and another $6 million to start the new, higher-margin businesses.

During the first half of 2020, the company and its investment banker ran a dual-track process seeking either outside investment or an acquisition proposal. No

one expressed any interest in an investment. The company received a few indications of interest in an acquisition, but none at values greater than $10 million.

In July 2020, having shown patience far beyond what one might generally expect from a homerun-ardent venture capitalist, the fund proposed to acquire the company's remaining shares through a cash-out merger. The fund was willing to put more capital into the company, but only if it owned all of the equity.

The proposed transaction valued the company at $12.5 million on a cash-free, debt-free basis. In a change of control at that valuation, the liquidation preferences associated with the fund's preferred stock and the repayment premiums associated with its debt would garner all of the consideration. Taking those claims into account, the company's valuation would have to reach $40 million before the common stockholders would receive anything. There was no market evidence that anyone believed the company was worth that much.

The fund did not condition its offer on the twin *MFW* requirements—approval from both an independent special committee and a majority of the unaffiliated stockholders. At trial, the defendant directors explained persuasively that the company lacked the funds to support a full-blown *MFW* process.

The fund did condition the merger on the prior approval of the company's three unaffiliated directors. The fund also proposed a comparatively open post-signing go-shop. The company could shop the offer freely, the fund would not have any match rights, and the fund would be obligated to sell into any bid that the unaffiliated directors deemed superior. The only knock was the go-shop's duration. At only three

weeks, it was short, and the company was not a high-profile entity. On the other hand, the go-shop followed an exhaustive pre-signing outreach, and during the go-shop, the company focused on those few potential counterparties who had expressed some level of interest in a transaction.

The unaffiliated directors voted in favor of the merger by a two-to-one vote. The company's founder, who remained on the board, voted against. The fund had sufficient voting power to approve the merger at the stockholder level, and it did.

The merger closed initially in September 2020, but the deal had not been structured optimally for the fund from a tax perspective. Fortuitously, the lawyers had neglected to have the acquisition vehicle's stockholders—namely the fund—vote on the merger. The company and the fund declared the initial closing void, restructured the deal to meet the fund's tax objectives, then closed a second time in in December 2020.

A group of common stockholders led by the company's founder sought appraisal. They also asserted plenary claims for breach of fiduciary duty against the directors and a claim for aiding and abetting by the fund. The plaintiffs challenged not only the merger but also a two of the preceding debt financings where the fund supplied the company with desperately needed capital.

In the appraisal proceeding, each side had the burden of proving its valuation position. The plaintiffs did not present a credible valuation. The defendants made a convincing case that the fair value of the plaintiffs' shares at the time of the merger was zero.

For purposes of the plenary claims, the defendants bore the burden of proving that the financing transactions and the merger were entirely fair. They carried that burden.

Judgment will be entered against the plaintiffs and in favor of the defendants.

## I.    FACTUAL BACKGROUND

Trial lasted four days. The parties introduced 692 exhibits, including thirteen deposition transcripts. Five fact witnesses and two experts testified live.[1]

When cases go to trial, there are invariably at least two plausible ways to view the evidence. One side generally has an account that is shorter, tighter, and reads well on paper. The other side proffers an account that takes longer to unfold, requires drawing inferences from combinations of documents, testimony, and events, and turns on credibility determinations. Here, the plaintiffs benefitted from the shorter, tighter story. They pointed to a squeeze-out transaction, cited some internal documents that sounded bad for the defendants, and claimed that the defendants had sought to take them out at too low a price. The defendants proffered the more complex account, and it depended on the court rejecting the founder's assessment of the company's prospects.

---

[1] The parties agreed to seventy stipulations of fact, cited as "PTO ¶ _." Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" reference trial exhibits. Citations in the form "Argument Tr." refer to the post-trial argument.

4

The court did not find the founder credible. While he did not affirmatively lie, his assertions about the company and its prospects for success were Panglossian in the extreme. He also had difficulty accepting any responsibility for his own role in the company's demise. When presented with evidence challenging his assertions, he generally fell back on the retort that he simply knew better than anyone else. Where the company was concerned, he was too close to his creation to be objective.

Having evaluated the witnesses and weighed the evidentiary record as a whole, the court makes the following factual findings.

## A.    The Company

Akademos, Inc. (the "Company") described itself as an education-technology firm. Its principal business involved operating virtual bookstores for educational institutions like colleges and universities. Plaintiff Brian Jacobs founded the Company in 1999 and served initially as its Chief Executive Officer and sole board member.

During the more than two decades from 1999 to 2020, the Company never had a profitable year. Not surprisingly, the Company suffered regular cash shortfalls. Virtually every spring, the Company needed outside financing to continue as a going concern.

Initially, Jacobs raised the additional capital from friends and family. He also found angel investors through investment forums. In return for their capital, they received common stock. Some investors bought stock at prices as high as $26 per share.

## B. The Fund

In 2009, Jacobs sought venture capital financing. Despite the Company's decade-long record of losses, Jacobs could tell a compelling story. After all, Amazon started as an online bookstore, and operating online bookstores for educational institutions seemed like a good niche. Jacobs stressed that although selling books was a low margin business, the Company could be immensely profitable if only it could achieve sufficient scale.

One of the firms Jacobs approached was Kohlberg Ventures, LLC (the "KV Fund"), the venture capital affiliate of Kohlberg & Company. Jerome Kohlberg, Jr. and his son James Kohlberg founded Kohlberg & Company after their departure from Kohlberg Kravis Roberts & Co., now the private equity behemoth known as KKR.

In July 2009, the KV Fund invested $2.5 million in the Company.[2] In return, KV Holdings received shares of Series A Preferred Stock. The Series A Preferred carried a liquidation preference. The Company was obligated to pay the liquidation preference upon a "Deemed Liquidation Event." JX 692 at '751. More on that later.

As part of the investment, the Company's board of directors (the "Board") expanded from one seat to three. The KV Fund had the right to appoint a director,

---

[2] Technically, James Kohlberg invested the funds through Bay Area Holdings, Inc. ("Bay Holdings"), one of his personal investment vehicles. The distinction between the KV Fund and Bay Holding is not important for purposes of this case, and it makes the factual account unnecessarily complex. For simplicity, this decision treats the KV Fund as having provided all of the capital, even though Bay Holdings made some of the investments.

and it designated Bill Youstra, a partner in the KV Fund. The third seat was reserved for a mutually acceptable independent director, and Jacobs and the KV Fund agreed on Scott Eagle.

## C. The 2010 Cash Crisis

The capital from the KV Fund did not last long. In March 2010 and again in April 2010, the KV Fund invested another $500,000. In exchange, the KV Fund received additional shares of Series A Preferred.

That capital did not last long either. In August 2010, Jacobs approached John Eastburn, a co-founder of the KV Fund, with an urgent request for additional cash. The KV Fund agreed to provide another $200,000 in exchange for a promissory note. The Company's chief financial officer—not Jacobs—also provided $200,0000 in exchange for a promissory note.

## D. The KV Fund Acquires Control.

The Company's serial demands for capital caused the KV Fund to lose confidence in Jacobs. In 2011, the KV Fund invested $1,831,160 in exchange for shares of Series A-1 Preferred Stock. Together with its earlier investments, those shares gave the KV Fund majority voting control.

The KV Fund conditioned its investment on a CEO transition. Jacobs agreed to step down, and he supported the search for a new CEO. In April 2011, the Company hired John Squires. Jacobs transitioned to a new role as President, charged with focusing on the Company's big-picture strategy.

7

Squires recommended expanding the Board, and the KV Fund agreed. They added Eric Fingerhut as an outside director. Fingerhut was the former head of the Ohio State Board of Regents, and Squires thought he could provide introductions that would help drive sales.

The Company continued to burn cash. By fall 2012, the Company faced a budget shortfall of approximately $1 million. Jacobs began sharply criticizing Squires during board meetings. Faced with a choice between Jacobs and Squires, the Board chose Squires.

In December 2012, Jacobs left the management team. He remained a member of the Board. Jacobs stipulated in the Pre-Trial Order that he resigned. PTO ¶ 34. But at trial, he claimed he was terminated. Consistent with the stipulated fact in the Pre-Trial Order, Eastburn testified that Jacobs resigned to focus on a new business, called panOpen. Jacobs began planning that new business while still at the Company, and when Jacobs departed, he agreed to provide the Company with a 10% equity stake in panOpen in return for waiving his noncompete clause.

E.     **The Barnes & Noble Deal**

In 2015, the Company seemed to be making some headway, and its gross sales passed $33 million. *See* JX 643. Seeking funding to support further growth, the Company hired a boutique investment bank to find an investor willing to buy a minority position. The effort generated little interest, and after six months, the Company terminated it.

8

Despite failing to raise capital, the Company did receive an unsolicited indication of interest from Barnes & Noble Booksellers, Inc. to acquire the Company for approximately $30 million. The Board authorized Squires to negotiate, and the two sides agreed in principle to a stock-for-stock transaction at the $30 million valuation. The Board, including Jacobs, approved the transaction in principle, and the Company and Barnes & Noble executed a term sheet.

In November 2015, however, the Company learned that one of its largest customers—City College of Chicago—might seek to rebid the Company's contract. Squires told Barnes & Noble, and they lowered the purchase price to $20 million. Squires tried to get City College to commit to its contract, but City College refused.

Meanwhile, Youstra asked Jacobs for help securing consents approving the deal from the common stockholders. *See* JX 12. Jacobs responded by expressing concern that at the $30 million valuation, some common stockholders would take a loss. Jacobs asked the KV Fund to reduce its liquidation preference by approximately half to make the common stockholders whole.

Later that month, Jacobs and Eastburn met at a coffee shop. Jacobs reiterated his request that the KV Fund make the common stockholders whole. He also asked for stock grants for three of the Company's executives. Jacobs Tr. 18–19. Jacobs testified that he offered to contribute some of own proceeds. *Id.* at 19. He recalled that Eastburn reacted with "hostility," became irate, and told Jacobs "so sue us." *Id.* at 20.

Eastburn recalls responding differently. He remembers pointing out that "the only common that's making money here is named Jacobs." Eastburn Tr. 274. He also

9

recalled proposing to share the make-whole amounts pro rata. And he recalled that Jacobs refused, saying "[t]hose are my founder shares, no way." *Id.*

Regardless of what happened, Eastburn and Jacobs walked away distrusting each other. Eastburn testified that after this meeting, "every time that [Jacobs] said he was looking out for the rest of the common, I was skeptical." *Id.*

The dispute about sharing value proved premature. In December, Barnes & Noble terminated discussions.

## F.    The Going Concern Qualification

Starting in 2015, the Company's audited financial statements began including a going concern qualification. The auditors noted that the Company's "significant operating losses and working capital and shareholders' deficiency raise substantial doubts about its ability to continue as a going concern." JX 14 at '836. In a later footnote in each financial statement, the auditors elaborated on the qualification. *Id.* at '843–44. In 2017, they wrote:

> The Company's primary financing sources include a line of credit with Avidbank, promissory notes payable to the State of Connecticut and certain financial institutions, and periodic debt and equity infusions from its largest shareholder. Management believes the Company's ability to continue as a going concern is uncertain without the ability to both renew and obtain new financing from all these sources, or new ones. . . . [S]o, management has concluded, under the standards of Financial Accounting Standards Board Accounting Standards Update 2014-15, that doubt exists regarding the Company's ability to continue as a going concern.

JX 244 at '801. The Company's audited financials carried similar warnings in 2016, 2017, 2018, 2019, and 2020. JX 14; JX 75; JX 243; JX 244; JX 356.

10

## G.    The KV Fund Invests More.

Despite improved performance in 2015, the Company remained unprofitable. In 2015, the KV Fund loaned the Company another $4.6 million.

In 2016, the management team projected that the Company was two years away from profitability. Eastburn Tr. 269. To bridge the gap, the KV Fund invested another $1 million in return for Series B Preferred Stock (together with Series A Preferred Stock and Series A-1 Preferred Stock, the "Preferred Stock"). The KV Fund also converted $3 million of its loan into Series B Preferred. JX 18; Eastburn Tr. 269. The KV Fund wanted shares of Series B Preferred valued at two times the converted debt. Jacobs negotiated them down to 1.5 times. The investment implied an equity value for the Company of $34 million. On a fully diluted basis, that equated to a value of $26.75 per share. JX 18.

The KV Fund believed the Series B round would be "the last money going in." Eastburn Tr. 269. In connection with the Series B investment, Fingerhut and Eagle left the Board. Eastburn replaced Fingerhut. After a director search, Gary Shapiro replaced Eagle. Shapiro was an industry veteran who served in various roles in the college store space since 1968. Shapiro and his wife, though his wife's firm, had served as consultants to the Company since the beginning of 2016. The Company agreed to pay Shapiro $25,000 per year for his Board service.

## H.    The 2018 Note

In spring 2018, the Company again needed financing. The KV Fund provided it, this time in the form of a $2 million convertible promissory note. In the event of a

11

change in control, the Company would redeem the note for one-and-a-half times the unpaid principal and interest (the "2018 Note"). The 2018 Note would become due in March 2019, one year later. The KV Fund offered to let any of the common stockholders participate in the loan on the same terms, but all declined. The Board, including Jacobs, unanimously approved the 2018 Note.

Also during March 2018, Jacobs emailed Eastburn about the KV Fund buying some of his shares so Jacobs could use the capital for a new venture. Eastburn told him that they might want to buy all of his stock, but not part of it. He also said that valuing the stock would be tricky. JX 43.

Later that day, Jacobs and Eastburn spoke by phone. Jacobs recalled an offer of $10 per share for total consideration of $1.4 million, implying a value of $40 million for the Company. JX 41; Jacobs Tr. 31. Eastburn testified that he only had authority to offer up to $350,000 for Jacobs's stock and did not exceed his authority. Eastburn Tr. 289–294. Regardless, Jacobs came away believing the KV Fund had offered $10 per share, which he rejected as too low.

The Board decided to seek out additional third-party financing. The Company had secured some new contracts, and Follett Higher Education Group ("Follett") had told Squires that they might be interested in a deal. This time, the Company hired a different boutique investment bank to seek investors for a $5-10 million round. The result was the same. No one wanted to invest.

In parallel, Squires and the investment bank approached Follett and proposed an acquisition at a valuation of $50 million. Eastburn thought a transaction in range of $20–30 million was more realistic and told Jacobs that. JX 59 at 12:30–13:00.

Jacobs came to believe that Follett made an offer to acquire the Company for $30 million and the KV Fund rejected the offer without presenting it to the Board. While Jacobs may have thought that, the evidence does not support it. It seems as if at some point, Follett may have floated the possibility of a potential acquisition in the range of $30 million, but there is nothing in writing suggesting any conviction behind the figure, and it was clearly not an actionable proposal.

## I.    The Board Hires A New CEO.

In May 2018, the Board terminated Squires and hired Raj Kaji as the Company's new CEO. Jacobs contends that the KV Fund terminated Squires and hired Kaji without involving the Board, but the record does not support that assertion.

It is true that Eastburn and Youstra led the replacement process. They obtained a list of potential candidates from an executive recruiter, and they spoke with Shapiro about a change in leadership. After Shapiro agreed that a change would be beneficial, Eastburn and Youstra involved him in the process, and he interviewed the potential candidates.

It is also true that Eastburn and Youstra excluded Jacobs from the process until they were ready to present a candidate for Board approval. Eastburn, Youstra, and Shapiro all thought that involving Jacobs would be detrimental: Jacobs had

13

previously disclosed confidential information learned during a Board meeting, and he was starting a new firm that was a quasi-competitor.

Ultimately, the other directors did involve Jacobs. On May 4, 2018, Eastburn met with Jacobs in person and told him about the plan to replace Squires with Kaji. JX 59 at 9:10–10:00; JX 60; JX 61. Jacobs did not object, and he agreed that a change of management was beneficial. JX 59 at 13:00–14:00. A week later, Eastburn emailed Jacobs about the CEO-replacement plan. JX 64. Again, Jacobs did not object. *Id.* at '699.

At Jacobs' request, Eastburn facilitated a call between Kaji and Jacobs. JX 65. Jacobs had a relatively favorable impression of Kaji, noting that he had "[a] lot of experience in Education [sic]." JX 67 at '715. There is no contemporaneous evidence that Jacobs raised any objection to hiring Kali.

The Board approved Kaji's appointment as CEO on May 16, 2018. Jacobs abstained, stating, "I was not informed nor did I participate in any aspect of the decision to change the CEO. I said that, while I wasn't necessarily against a change I should have been part of the discussion and process and that I could have contributed to both . . . ." . JX 74 at '136. At trial, Jacobs portrayed the CEO selection process as evidence of the KV Fund's control over the Company. The KV Fund did control the Company, but there is no reason to think that the selection of Kaji was unfair or could otherwise constitute a breach of duty.

14

During the same period, Eastburn approached Jacobs about the KV Fund buying his shares and having him resign from the Board. Having seen Jacobs criticize Squires, Eastman wanted Kaji to have a "clear path" to succeed. JX 59 at 19:00–24:00.

Jacobs reacted defensively and asked why the KV Fund didn't just buy the Company. Eastburn noted that Jacobs previously had suggested valuations around $70 million, which was not realistic, and that at present, the common was worth nearly zero given the capital structure. *See id.* at 23:00–25:00. Eastburn noted that the Company was likely to need additional investment that would further dilute the common stockholders, otherwise the Company might liquidate. *Id.* at 25:00.

> Jacobs dug in, stating
>
> I am going to stay on the board until there is some reasonable exit after all these years and years of work and trying to support this company in every way that I could. I would hope that you'd understand that I am just trying to protect myself, my family, . . . and to the extent that I can the other common holders.

*Id.* at 25:45–26:06. Becoming irritated, Eastburn told Jacobs that he had been "obstructionist from day one" and had not been "working in good faith." *Id.* at 26:10–26:55. Jacobs then attacked the decisions that Squires and his team had made over the past seven years. Eastburn reiterated that there could be a recapitalization in which "the common gets significantly diluted" and that it was Jacobs's choice if he wanted "to be on the board when that happens." *Id.* at 31:45–32:10.

The conversation ended in frustration for both sides. Jacobs then tried to go over Eastburn's head by sending a letter to James Kohlberg and asking him to replace

15

Eastburn on the Board. Jacobs blamed Eastburn for the Board's disfunction and the Company's lack of progress. The KV Fund ignored the letter.

## J. The September 2018 Board Meeting

Kaji spent his first few months assessing the Company. During a board meeting on September 6, 2018, he provided his impressions.

Kaji thought the Company needed to strengthen the management team and increase its scale to make a thin-margin business profitable. Kaji then laid out a plan to develop two new lines of business. He also proposed to recruit two advisors with experience in the education technology industry.

Kaji also noted that the Company had regularly missed its revenue forecasts. On average, the Company overestimated revenue for new accounts by 24.3% and for existing accounts by 3.4% to 9.7%. Based on that history, Kaji reported that management had reduced the Company's projected revenue. Given the new figures, he projected that the Company would need another $1.25 million to avoid insolvency.

After the meeting, Jacobs and Eastburn had another heated conversation, this time about the upcoming annual meeting. Eastburn criticized Jacobs for "juvenile" conduct and asked again that he leave the Board. JX 90 at '723. Jacobs responded that Eastburn should leave and "Jim Kohlberg should come in." JX 89. After the call, Jacobs pulled together a group of common stockholders who wrote to Kohlberg and asked to him to replace Eastburn. JX 93; JX 94.

This time, Kohlberg agreed to join as an additional director. Meanwhile, Kaji looked for two advisors who might later join the Board. He found one: Burck Smith,

who joined the Board in September 2019. When Smith accepted the position, he refused to take his compensation in stock options and asked for a cash retainer. Smith did not think the common stock would have any value short of a deal at $41 million or more, and he doubted that a transaction could achieve more than $20–$30 million. JX 183 at '253–54. The Company rejected his request, and Smith ultimately agreed to accept $25,000 and a small option package. Smith Tr. 590. Jacobs objected to Smith joining the Board because of his refusal to take stock options as compensation.

## K.   Potential New Lines Of Business

Under Kaji's leadership, management began developing potential new lines of business. Kaji also successfully negotiated a $700,000 increase in the Company's revolving line of credit, plus $800,000 in trade credit from its venders.

In December 2018, Kaji presented the Board with ideas for two new businesses. One was Courseware Integration Software ("Courseware"), which would help educational institutions and publishers exchange data and work together on course content. The Company envisioned monetizing the concept by charging publishers a fee.

The other was Edge Equitable Access ("Edge"), which would allow institutions to deliver course materials to students and bill them directly. The Company envisioned monetizing this service by charging a fee to colleges and universities.

Management hoped the new offerings would be high margin businesses. But management also estimated that developing them would require approximately $11 million in additional capital. JX 105 at '118. Although that figure was daunting,

17

management believed that there was a "bigger risk [in] not doing anything." *Id*. The Board authorized management to proceed.

**L.     The 2019 Note**

In January 2019, management contacted the same boutique investment bank that had led the most recent process. But the Company's contact there had left, and the investment bank did not want to make another attempt. Four other banks declined as well. The bankers all thought that the Company needed to identify significant new accounts to raise more capital, or it needed a letter of intent for a promising acquisition that the new investors could back. After hearing the report, the Board pushed off the fundraising effort until late March or early April, after the Company hopefully secured new customers.

In the meantime, the Company needed $2.25 million to fund its operations through August. Kaji asked Eastburn about the KV Fund providing the money. Eastburn suggested a loan that only would be repayable in the event the company was sold, at which point the Company would owe two times the unpaid balance of principal and interest. Eastburn thought the terms were market, and Kaji thought the request was reasonable. JX 113.

On March 6, 2019, the KV Fund sent the Company a term sheet for a convertible note in the amount of $2 million (the "2019 Note"). JX 114; JX 115. The term sheet tracked Eastburn's proposal and also contemplated extending the maturity date for the 2018 Note in exchange for updating its terms to match the 2019 Note. *Id*.

Kaji circulated the term sheet to the non-KV Fund directors. Kaji then had calls with Shapiro and Jacobs to discuss the terms. He also noticed a special meeting of the Board to discuss the term sheet from KV Fund. Before the meeting, management proposed revisions to KV Fund's original term sheet, including increasing the amount of the loan to $2.25 million and allowing any current investor in the Company to participate in the financing up to $750,000.

During a board meeting on March 26, 2019, Jacobs objected to the term sheet. He proposed different terms, but Kaji explained that the KV Fund had already rejected a similar counteroffer. Jacobs then asked management to search for better financing from other lenders. Jacobs Tr. 160–61. But management had already tried to hire an investment bank to accomplish that, and no one would take on the assignment.

With Jacobs abstaining, the Board approved the amendment to the 2018 Note. JX 124 at '523–24. The directors also approved the 2019 Note, subject to management making a further effort to secure better financing. Management complied and contacted thirteen additional parties over a six-week period. PTO ¶ 49

That limited process resulted in two alternatives. Concise Capital offered a $2.5 million loan with a mid-double-digit interest rate conditioned on a guarantee from the KV Fund. Avidbank, one of the Company's existing lenders, offered bridge financing, conditioned on both a guarantee from the KV Fund and an escrow account containing funds earmarked to repay the loan. JX 145; JX 146. During a meeting on

19

April 25, 2019, the Board considered the alternatives but did not make any decisions. JX 144 at '489.

Meanwhile, Jacobs and a group of common stockholders hired counsel. On April 16, 2019, their lawyer wrote the Board expressing concerns about 2019 Note and accusing the directors of failing to fulfill their fiduciary duties. JX 138. The Company responded two weeks later and denied the allegations. JX 147.

During a meeting on May 2, 2019, Kaji provided an update on the financing effort. JX 148. He reported that none of the stockholders who were accredited investors expressed interest in participating in the proposed 2019 Note. He also reported on the two financing proposals and noted that the KV Fund was willing to provide a guarantee, but not to put cash in escrow. That meant the Avidbank deal was a non-starter. Concise Capital wanted Avidbank to subordinate its existing debt, which was also a non-starter.

Jacobs then proposed that the Company accept the 2019 Note, but only if it matured on September 30, 2019 and only required repayment at 1.5x face value. Management did not believe the KV Fund would accept. After further discussion, the Board voted to approve the 2019 Note, with Jacobs abstaining.

With the 2019 Note added to the capital structure, the KV Fund was entitled to receive the first $29.7 million from any change-of-control transaction. JX 180 at 12. A deal would have to exceed that amount before the common stockholders received anything.

20

**M.  Jacobs Attempts To Rally The Stockholders.**

After the Board approved the 2019 Note, the Company sent a notice to the common stockholders soliciting their consent. *E.g.*, JX 150 at '587. Jacobs sought to rally the common stockholders against the financing, and a group of common stockholders vocally objected. *E.g.*, JX 150; JX 151. Jacobs led a call to explore legal options during which he claimed the Company's value was around $40 million. JX 158. But not all the common stockholders supported him. At least one stockholder thought the value of the Company was far less. *See* JX 159.

On June 24, 2019, the lawyer Jacobs had retained sent another letter to the Company objecting to the 2019 Note. JX 167. The Board met the next day. JX 170; JX 171. The record does not contain minutes for the meeting, but Jacobs' took notes documenting several heated exchanges. JX 166. Two weeks later, the Company responded to the attorney's letter and denied its allegations.

**N.  The Loss Of Customers**

During the June 2019 Board meeting, management reported that the Company might lose City College as a customer, which would cost the Company about 25% of its revenue. Kaji Tr. 546. To offset the projected loss, management engaged in cost-cutting.

Management also prepared a set of projections showing that the Company could replace the revenue attributable to City College, but only through a "Herculean effort" that would require "a lot of sales and marketing effort and dollars." Kaji Tr. 547–48. Even then, the Company would run out of cash in May 2020. JX 171 at '516.

On September 17, 2019, the Board convened a regular board meeting. While in executive session, the Board unanimously approved a valuation for purposes of granting equity compensation in accordance with Internal Revenue Service Rule 409A. The valuation put the Company's enterprise value at $38.5 million and valued the common stock at $13.41 per share. JX 179. After applying a 35% discount for the stock's lack of marketability, the valuation landed at $8.71 per share (the "2019 Rule 409A Valuation."). The Board unanimously approved the valuation. JX 188.

## O. The Dual-Track Process

In late 2019, management began working in earnest on a potential acquisition or strategic combination that could be used to justify raising new capital. Initially, management reached out to potential strategic partners where they had contacts. Two contacts—RedShelf, Inc and Kivuto Solutions—had no interest. Two others did: Ambassador Education Solutions ("Ambassador") and Nebraska Book Company ("Nebraska Book"), where Shapiro had been a director since 2017.

On November 5, 2019, Ambassador expressed interest in a stock-for-stock transaction that valued the Company at between $5,400,000 and $17,200,000. After discussions with Company management, Ambassador proposed a transaction that valued the Company at $10.3 million with consideration consisting of 25% stock and a promissory note for the other 75%, to be paid off over the two years after closing. JX 213 at '652; JX 211 at tab 2, cells D14–28.

On November 24, 2019, Nebraska Book expressed interest in acquiring the Company based on a total enterprise value of approximately $17 million. The

22

proposal implied an equity value of $10.3 million, to be paid shares of Nebraska Book stock. Nebraska Book was not publicly traded, so it was offering its own illiquid securities. PTO ¶ 55; JX 202. As an alternative, Nebraska Book and the Company discussed having the Company acquire one of Nebraska Book's business lines.

The Board discussed the proposals during a meeting on December 5, 2019. JX 213; JX 215. Shapiro recused himself because of his role at Nebraska Book.

Both proposals were far below the implied valuations that Barnes & Noble and Follett had put on the Company in 2015. Kaji suggested hiring an investment banker to conduct a dual-track process, with one track focusing on fundraising and another on M&A. Kaji reported that management had contacted a range of investment bankers and only two were interested: Parchman Vaughn & Company L.L.C. and Cherry Tree & Associates LLC. He discussed their qualifications and proposed fee structures. The Board signed off on hiring an investment banker and directed management to negotiate final proposals. Jacobs abstained from the vote. JX 215.

The Board met again on December 10, 2019. JX 218. Kaji described the Company's existing college store business as "an unprofitable core business that needs scale to be profitable" but emphasized that the Company was "at the cusp of profitability." JX 219 at '767. Kaji then discussed options the Company could pursue to improve profitability. He did not think additional personnel cuts were viable. *Id.* at '768. He also advised that even at scale, the core business "will produce low margins and [would] not result in substantial EBITDA gains even after growing

23

materially." *Id.* at '769. He recommended that the Company needed to focus on new initiatives. *Id.* at '770–79.

On January 10, 2020, the Board held a special meeting to hire an investment bank to hire and review management's projections. JX 245. Cherry Tree did not seem truly interested in the engagement, so management contacted two other firms. Neither seemed like a good fit. By contrast, Parchman Vaughan was both eager and qualified, having worked in the education space for over twenty years. *Id.* The Board, including Jacobs, approved engaging Parchman Vaughan.

Management's forecasting indicated that the Company need to raise $9–10 million. After meeting with Parchman Vaughn, management opted to seek $8 million: $1.5 million to launch Edge, $4.5 million to launch Courseware Integration Software, and $2 million to sustain existing operations. JX 280 at '481.

Parchman Vaughn led a process that started in February 2020 and ended in September 2020 (the "2020 Process"). PTO ¶ 57. In total, Parchman Vaughan and the Company contacted 120 different parties, including contacted 31 strategic buyers and 66 financial investors. The list included Barnes & Noble and Follett. JX 440 at '205.

The response was underwhelming. The Company received only one acquisition proposal before the original bid deadline of March 31, 2020: A firm doing business as eCampus proposed to buy the Company for $6 million. The Company received three proposals after the bid deadline, but no one expressed interest in an investment.

The Board met twice in March 2020 to discuss the COVID-19 pandemic and review the results of the 2020 Process. Everyone agreed that the COVID-19 pandemic

24

had a negative effect. In addition, by the time of trial, no one thought that Parchman Vaughn did a great job. Kaji described the effort as "satisfactory" and thought it could have been better. Kaji Tr. 466.

The plaintiffs claim Parchman Vaughan marketed the Company as a distressed asset. Jacobs Tr. 82–85. Parchman Vaughan admittedly did not include a target valuation for the Company in its materials. The lead banker testified that Kaji had discussed a $20 million valuation, but that figure was hard to support for a company that had always lost money, so Parchman Vaughn decided to emphasize the Company's story and let the market set the valuation. Rowan Tr. 669–70. In hindsight, not providing a target valuation may have been a mistake, but it was a reasonable approach.

**P.      The 2020 Note**

By April 2020, as expected, the Company was again running out of cash. Meanwhile the 2020 Process had failed to generate any interest.

In early April 2020, Eastburn, Youstra, and Kohlberg discussed what the KV Fund should do. JX 310. Options included selling the Company, providing bridge financing, or letting the Company file for bankruptcy. They decided on a bridge loan of $1–1.5 million to cover the Company through the fall, when they hoped to market the Company for sale again. They did not consider acquiring 100% of the equity.

On April 8, 2020, the KV Fund sent the Company a term sheet for another convertible note financing transaction, this time in the amount of $1 million with the potential for another $500,000 if the Company hit certain targets (the "2020 Note,"

25

together with the 2018 Note and 2019 Note, the "KV Notes"). JX 312; PTO ¶ 53. The terms were nearly identical to the 2018 and 2019 Notes. The one major difference was that the 2020 Note was secured and would mature in six-months. That was also when the 2018 and 2019 Notes would mature.

Kaji responded by asking the KV Fund to extend the deadline on all of the notes. The KV Fund declined.

The Board met on April 15, 2020 to review the 2020 Process and consider the KV Fund's term sheet. JX 319. By this point, management and Parchman Vaughan had contacted 101 parties, Parchman Vaughn contacted 97 and Kaji contacted 4. Discussions with eCampus led to a revised acquisition proposal that increased the consideration by $1 million to $7 million. PTO ¶ 57. Parchman Vaughan recommended against further discussions with eCampus because the offer was so low. JX 319.

Kaji reported that he had a promising conversation with the CEO of RedShelf, and the Board authorized Kaji to offer to sell the Company for $20 million, half in cash and half in RedShelf stock. *Id.* at '345. Kaji also reported on his dialogue with Kivuto, which was finishing a fundraising process and suggested re-engaging after that ended. The Board authorized Kaji to continue those discussions. *Id.*

After that, the Board turned to the 2020 Note. Kaji reviewed the terms, then moved to accept the offer. Jacobs objected, arguing that the terms were too onerous. He also wanted new leadership. With Jacobs abstaining, the Board voted to move

26

forward. JX 319 at '346. At a meeting one week later, the Board approved the 2020 Note, with Jacobs again abstaining. JX 323.

Just as the COVID-19 pandemic ended up helping other technology firms, the pandemic also benefitted the Company. The shift to online education increased demand for the Company's services, and in June 2020, Kaji reported to the Board that the Company had signed a record-high twenty-two new deals. JX 353. But despite adding new institutions, the Company remained unprofitable for the year.

The dual-track process continued to yield disappointing results. Since the original March 31 bid date, the Company received only one new offer: A distressed debt investor offered $5 million in senior-secured, super-priority debtor-in-possession financing if the Company filed for bankruptcy. The conversations with RedShelf and Kivuto did not yield any offers.

During a Board meeting on June 18, 2023, all of the directors except for Jacobs believed a merger or sale of the Company was the best outcome. Jacobs wanted the Company to remain independent, arguing it would "thrive in the current environment with revision to its strategy and Board composition." JX 345 at '847. Jacobs claimed that management's "lack of vision" would lead the Company into bankruptcy. *Id.*

### Q. The Kohlberg Ventures Term Sheet

On July 13, 2024, the KV Fund offered to acquire the Company based on a cash-free, debt-free valuation of $12.5 million. PTO ¶ 57. The term sheet did not condition the transaction on the twin *MFW* protections of special committee approval and a favorable majority-of-the-minority vote. The three Kohlberg-affiliated directors

27

did commit to recuse themselves from meetings when the Board discussed the proposal. JX 373. The term sheet contemplated a go-shop period, and the KV Fund committed to support any transaction that the non-KV Fund directors deemed superior. The term sheet treated the transaction as a Deemed Liquidation Event, triggering the liquidation preference on the KV Notes and the Preferred Stock.

The Board met on July 15, 2024. JX 435. Parchman Vaughan reported that they had contacted sixteen additional parties, all of whom focused on distressed businesses. Three expressed potential interest and two started diligence. No one suggested a valuation, but Parchman Vaughan expected any offer to be well below the Company's target of $20 million. *Id.* In response to a question from Jacobs, Parchman Vaughn explained why the valuations were so low despite the Company's strong revenue numbers, citing

> (i) general market conditions, including the competitive nature of the Company's business and the low valuation of comparable companies such as Barnes & Noble, (ii) the impact that COVID-19 has had, and is continuing to have, on higher education broadly, and (iii) even though the Company's core business is growing, it has not been profitable after 20 years of operation, and its new software-based initiatives are too young to rely on or be able to adequately forecast against.

*Id.* at '597.

The Board then turned to the KV Fund's offer. Kaji asked the KV Fund directors to remain to answer questions. Eastburn expressed support for the go-shop. Jacobs asked whether the term sheet was confidential because he had a personal interest in seeking a better bid. Kaji said that Jacobs could talk with third parties as long as there were confidentiality agreements put in place.

28

The KV Fund directors left the meeting, and the remaining directors discussed the term sheet. Jacobs said he could not support the deal because none of the common stockholders would receive any value. Kaji said the same thing would happen in any deal. After further discussion, Kaji, Smith, and Shapiro voted to have Kaji negotiate with the KV Fund over the term sheet, Jacobs abstained.

Between July 15, 2020 and July 28, 2020, Company management negotiated the term sheet with support from Parchman Vaughan and Company counsel. The terms did not materially change. *See* JX 400.

While the negotiations were underway, Ames Watson LLC, a financial investor, offered to buy a 75% stake in the Company for $500,000. JX 379. Ames Watson also offered to provide another $500,000 in return for additional equity.

The Board met on August 3, 2020. JX 402. Parchman Vaughan reported that no one other than Ames Watson had been responsive. The directors discussed the KV Fund's term sheet. Jacobs proposed his vision for the Company and envisioned deals with different strategic partners. Jacobs asked Eastburn whether the KV Fund would give him until December 31, 2020 to find a different deal. Eastburn refused.

The KV Fund directors left the meeting so that the unaffiliated directors could deliberate and vote. Jacobs objected to Shapiro and Smith voting, claiming that they were conflicted. The unaffiliated directors then voted two-to-one in favor of the KV Fund's term sheet, with Jacobs voting no.

29

## R. The Go-Shop

From August 4–25, 2020 Parchman Vaughan ran the go-shop. They did not recanvas everyone contacted during the 2020 Process. Instead, they contacted the four parties who had showed interest: eCampus, Ambassador, Ames Watson, and RedShelf.

Ambassador reiterated its interest in the deal it had proposed in December 2019—a $10.3 million valuation with the consideration consisting of 25% stock and a promissory note for the other 75%, to be paid off over the two years after closing. RedShelf"s CEO sent Kaji a text message expressing potential interest in a deal in the range of $10 million. Ames Watson responded that if the Company "can get anything close to [$12.5 million] they should run to closing." JX 410. eCampus did not respond.

On September 4, 2020, the non-KV Fund directors met to review the results of the go-shop. JX 415. They determined that none of the counterparties had made a superior proposal. Kaji then reported on a proposal by the KV Fund to provide some consideration to the common stockholders. At that point, the KV Fund held approximately $40 million in preference through its notes and preferred stock, leaving the common far out of the money. Nevertheless, the KV Fund offered to provide aggregate consideration to the common holders $0.24 per share, or total consideration of $51,234, but only if a majority of the common stockholders executed support agreements in favor of the deal, waived appraisal rights, and released any claims. Jacobs refused, saying the price was too low. Shapiro and Smith wanted to

ask for more for the common. The Board members authorized Kaji to negotiate with the KV Fund, resulting in the KV Fund increasing its offer for the common to $0.35 per share, or total consideration of $76,986.

The KV Fund sent the offer to the common stockholders on September 8, 2024. JX 416. Jacobs campaigned against it. Dale Kutnick, an angel investor who had invested $600,000 in the Company, responded to Jacobs and all of the common stockholders by saying that his "fatigue with your rants has now reached exhaustion. For 15 years you promised the moon, changed directions numerous times, burned cash, burned investors, exaggerated minor successes, obfuscated some major problems, and failed to ever make a profit." JX 420 at '328. After Jacobs reached out to Kutnick separately, Kutnick told Jacobs that he was "fantasizing again."

> The baby is now a 20-something year old indigent (or worse) that can't make its own way, and it's no longer cute and cuddly. Before we talk, what is your **PLAN to raise the necessary capital in a short period of time**, because the company is running on fumes based on the numbers I've seen? **Who is going to put up the capital if KV doesn't do it.**

JX 421 at '338. Kutnick nevertheless became a plaintiff in this action.

The KV Fund's offer did not receive sufficient support from common stockholders. Some common stockholders accepted it, but Jacobs and his supporters did not.

## S.    The Merger

From August 25 through September 29, 2020, the Company and the KV Fund negotiated the final deal documents. On September 29, Jacobs caused the attorneys representing a group of dissenting common stockholders to send another letter

31

objecting to the proposed Merger and representing that they would pursue their appraisal rights.

The Board met that same day to consider the Merger. Parchman Vaughan reviewed the 2020 Process, summarized the expressions of interest the Company received, and flagged that none of the four parties contacted during the go-shop made a meaningful bid. JX 549 at '113.

The directors then discussed the proposed Merger. After some discussion, the KV Fund directors left the meeting. After additional discussion, the unaffiliated directors approved the Merger by a two-to-one vote, with Smith and Shapiro voting in favor and Jacobs voting against. The KV Fund directors then rejoined the meeting and held a second vote. Everyone except Jacobs voted in favor. Jacobs voted against.

In November 2020, the KV Fund realized that the structure of the original Merger had negative tax consequences that could have been avoided. Conveniently, the Company also determined that Merger was technically defective under Section 251(c) of Delaware General Corporation Law (the "DGCL") because the stockholders of original merger subsidiary failed to properly approve the transaction.

The KV Fund proposed a redo. In response, the Board asked for and received an assurance that if the Company agreed to nullify the Merger, then the KV Fund would close a restructured transaction on the same terms and pay all the legal fees associated with the redo. The Board did not seek any additional consideration for the common stockholders. The KV Fund agreed, and on December 15, 2020, the Company

filed a Certificate of Correction with the Delaware Secretary of State through which Company cancelled the original Merger.

On December 22, 2020, the Board met to consider the restructured Merger. Parchman Vaughan gave its presentation again. Kaji explained that the stockholders could either ratify the Merger or redo the transaction. But because the redo conferred a tax benefit on the KV Fund, the KV Fund preferred that path. JX 493 at '963.

Jacobs implored the Board not to approve the do-over. The KV Fund directors left the meeting, and the unaffiliated directors discussed the Merger. Smith and Shapiro stated that "regardless of what had happened in the past, if the deal had been presented . . . today," he would vote to approve it. *Id.* at '964. The unaffiliated directors then voted, with Smith and Shapiro voting in favor and Jacobs voting against. The KV Fund directors returned, and the entire Board voted. Five directors voted in favor; Jacobs voted against.

The Company distributed the proceeds as if the Merger was a Deemed Liquidation Event. That meant the common stockholders received nothing.

## T.    After The Merger

The KV Fund operated the Company for roughly two years after the Merger. The Company gained some additional scale but remained unprofitable. The KV Fund invested another $3.5 million to pursue Edge, but it too remained unprofitable.

In late 2022, the KV Fund decided to pull the plug. Eastburn informed Kaji that the KV Fund would not provide any additional financing. The Company hired another investment banker and ran a dual-track process similar to the 2020 Process.

33

That process resulted in a sale of the Company to Vital Source Technologies, LLC ("VitalSource") for approximately $20 million. The sale closed on March 17, 2023 (the "2023 Sale").

The $20 million price from the 2023 Sale exceeded the Merger consideration by $7.5 million. After backing out the KV Fund's additional investment of $3.5 million, the 2023 Sale exceeded the Merger consideration by $4 million. For the KV Fund, its investment in the Company was a disaster, representing a loss of $18 million in invested capital.

## U. This Litigation

On January 8, 2021, the plaintiffs demanded appraisal. On April 22, 2021, the plaintiffs filed a joint petition for appraisal and complaint asserting claims for breach of fiduciary duty. The parties then conducted discovery and litigated the case through trial.

## II. THE APPRAISAL CLAIM

Jacobs and his group of common stockholders (the "Jacobs Group") sought appraisal under Section 262 of the DGCL. Technically, the Company is the respondent for purposes of the appraisal claim, but the Company emerged from the Merger as a wholly owned subsidiary of the KV Fund. The KV Fund controlled the positions the Company took in this litigation, and this decision therefore refers to the KV Fund as the real party in interest.

This decision finds that the fair value of Jacobs Group's shares is zero. Given the rights of the Preferred Stock, the common stock would not receive any value from the Company as a going concern.

## A.     Legal Principles Governing An Appraisal Proceeding

"An action seeking appraisal is intended to provide shareholders who dissent from a merger, on the basis of the inadequacy of the offering price, with a judicial determination of the fair value of their shares."[3] The appraisal statute states that "the Court shall determine the fair value of the shares"[4] and requires that the court "take into account all relevant factors."[5] The valuation must be "exclusive of any element of value arising from the accomplishment or expectation of the merger."[6]

Those statutory standards have significant implications. First, the statutory mandate that "the Court shall determine the fair value of the shares" results in a different allocation of the burden of proof than a standard liability proceeding. In an appraisal proceeding, "both sides have the burden of proving their respective valuation positions by a preponderance of the evidence."[7] "No presumption, favorable

---

[3] *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1142 (Del. 1989).

[4] 8 *Del. C.* § 262(h).

[5] *Id.*

[6] *Id.*

[7] *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. Ch. 2020) (cleaned up) (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).

or unfavorable, attaches to either side's valuation."[8] "Each party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium."[9]

Second, the statutory mandate that "the Court shall determine the fair value of the shares" means that the court has to arrive at a valuation, even if none of the parties' attempts are persuasive.[10] "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework *or to fashion its own*."[11] The Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto,* if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record."[12] Or the court "may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to

---

[8] *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989).

[9] *In re Appraisal of Stillwater Mining Co.* (*Stillwater Trial*), 2019 WL 3943851, at *18 (Del. Ch. Aug. 21, 2019) (internal quotation marks omitted), *aff'd sub nom. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020).

[10] *See Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 362 (Del. 1997) ("[T]he Court of Chancery may 'select one of the parties' valuation modes as its general framework, or fashion its own.'").

[11] *Id.*

[12] *M.G. Bancorporation*, 737 A.2d at 526 (emphasis added).

the resulting valuation."[13] If neither party satisfies its burden, "the court must then use its own independent judgment to determine fair value."[14]

Third, the language of the appraisal statute requires a specific approach to valuation. The Delaware Supreme Court has interpreted "the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of

---

[13] Jesse A. Finkelstein & John D. Hendershot, *Appraisal Rights in Mergers and Consolidations*, 38-5th C.P.S. § V(A), at A-31 (BNA, 2010 & 2017 Supp.) (collecting cases).

[14] *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004); *accord In re Orchard Enters.*, 2012 WL 2923305, at *5 (Del. Ch. July 18, 2012) ("After considering the parties' arguments and the respective experts' reports and testimony in support of their valuation positions, this court has discretion to select one of the parties' valuation models or to create its own."); *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 310–11 (Del. Ch. 2006) ("I cannot shirk my duty to arrive at my own independent determination of value, regardless of whether the competing experts have provided widely divergent estimates of value, while supposedly using the same well-established principles of corporate finance."); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) ("When . . . none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis."); *see Gonsalves*, 701 A.2d at 361 (emphasizing the trial court's responsibility to "independently determine the value of the shares that are the subject of the appraisal action"). The *Aruba* decision could be read to overrule precedent on this point and require a trial judge to use a valuation methodology that one of the party's advanced and which was subject to discovery and cross-examination at trial. *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 139–40 (Del. 2019) (per curiam). But *Aruba* can also be read as a situationally specific ruling that did not intend to depart from the appraisal statute's command or overrule longstanding precedent. *See Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 2024 WL 3579932, at *17 (Del. Ch. July 30, 2024). The latter reading is preferable, because the *Aruba* decision "does not suggest an intent to overrule prior precedent and set out a new framework for appraisal cases in which the trial court lacks the power to make its own valuation determination." *Id.*

the merger"[15] to mean the stockholder's "proportionate interest in a going concern."[16]

To apply this standard, the court must first "envisage the entire pre-merger company

as a 'going concern,' as a standalone entity, and assess its value as such."[17] Valuing

the corporation as a standalone entity means valuing its "operative reality" at the

time of merger, albeit in a but-for world where the merger did not take place.[18]

Valuing the corporation's operative reality means using the business plan the

company would have continued to pursue but for the merger.[19] It also means using

---

[15] 8 *Del. C.* § 262(h).

[16] *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 10 (Del. 2020) (explaining that a stockholder should be awarded "his proportionate interest in [the] going concern." (alteration in original) (quoting *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd,* 177 A.3d 1, 21 (Del. 2017)); *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp.*, 564 A.2d at 1144; *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 218 (Del. 1975). *But see DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 371 (Del. 2017) (describing fair value inquiry as examining whether stockholders "receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction").

[17] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1, 20 (Del. 2017).

[18] *Id.*

[19] *Cede & Co. v. Technicolor, Inc.* (*Technicolor IV*), 684 A.2d 289, 299 (Del. 1996) (holding that a fair value determination must account for the company's business plan "on the date of the merger"); *see Glob. GT LP v. Golden Telecom, Inc.* (*Golden Telecom Trial*), 993 A.2d 497, 507 (Del. Ch. 2010) ("The entity must be valued as a going concern based on its business plan at the time of the merger."), *aff'd*, 11 A.3d 214 (Del. 2010); *Del. Open MRI*, 898 A.2d at 314–15 ("Here, the business plan of Delaware Radiology involved the strategy of opening additional MRI Centers in

the company's actual capital structure but for the merger.[20] Valuing the corporation

exclusive of value attributable to the merger means disregarding "those elements of

value (which may be either positive or negative) that arise out of the Merger—as

contrasted with those elements of value associated with the ongoing business

Delaware with Edell. This strategy was part of what the Supreme Court would call the 'operative reality' of Delaware Radiology on the merger date and must be considered in determining fair value.").

[20] *See IQ Hldgs, Inc. v. Am. Com. Lines Inc.*, 2013 WL 4056207, at *3 (Del. Ch. Mar. 18, 2013) ("The cost of debt will be the weighted average of the actual cost of the Notes and American's revolving credit facility . . . , as of the Merger Date."), *aff'd*, 80 A.3d 959 (Del. 2013); *In re U.S. Cellular Operating Co.*, 2005 WL 43994, at *15 (Del. Ch. Jan. 6, 2005) ("The Court's task is to determine the fair value of the Companies as a going concern. Therefore, a potential, or even an actual, acquirer's cost of debt is not as informative to the Court as the surviving company's cost of debt, when that cost is available." (footnote omitted)); *Gilbert v. M.P.M. Enters., Inc.*, 1998 WL 229439, at *2 (Del. Ch. Apr. 24, 1998) ("In keeping with the Court's goal of determining with as much accuracy as possible the fair value of petitioner's shares on the merger date, the parties should use MPM's actual cost of debt when calculating the discount rate."), *aff'd*, 731 A.2d 790 (Del. 1999); *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 493 (Del. Ch. 1991) ("Even if Ms. Danyluk's hypothetical capital structure represents a debt to equity ratio that is closer to the industry average, defendants argue (and I agree) that the use of the industry average rather than Radiology's actual capital structure was improper. The entire focus of the discounted cash flow analysis is to determine the fair value of Radiology. I am not attempting to determine the potential maximum value of the company. Rather, I must value Radiology, not some theoretical company."); *see also Hintmann v. Fred Weber, Inc.*, 1998 WL 83052, at *5 (Del. Ch. Feb. 17, 1998) ("I agree that, if known, it is desirable to use a company's actual cost of debt.").

venture."[21] The corporation cannot be valued based on what a third party would pay in an acquisition.[22]

The valuation date in an appraisal is the date when the merger closes, not when the merger agreement was signed.[23] If the company's business plan changes between signing and closing, then the court must use the business plan in place at closing.[24] If the corporation's business plan includes known plans for expansion or value-enhancing changes to its capital structure, then its value as a going concern includes "non-speculative" elements of value attributable to those plans that are "susceptible of proof."[25] If the value of the corporation increases or decreases between

---

[21] *Cede & Co. v. MedPointe Healthcare, Inc.*, 2004 WL 2093967, at *7 (Del. Ch. Sept. 10, 2004).

[22] *M.P.M. Enters., Inc.*, 731 A.2d at 795 (explaining that the trial court must determine "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition"); *accord Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 217 (Del. 2010) ("[T]his Court has defined fair value as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction.").

[23] *Stillwater*, 240 A.3d at 17.

[24] *See Technicolor IV*, 684 A.2d at 299; *MedPointe Healthcare*, 2004 WL 2093967, at *8 ("The challenge for the Court is to determine the fair value of the going concern at the time of the Merger. By the time of the Merger, Carter-Wallace had sold the Consumer Products Division; it had incurred the capital gains tax liabilities and it had incurred the transaction costs. In short, the Court in an appraisal action values the stock that is merged with regard to its 'operative reality' as of the Merger." (footnote omitted)); *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 910 (Del. Ch. 1999) ("[T]he EquiMed Transaction was effectively in place at the time of the Cash-Out Mergers, as Cede requires.").

[25] *Technicolor IV*, 684 A.2d at 299; *accord Del. Open MRI*, 898 A.2d at 314–15 ("Obviously, when a business has opened a couple of facilities and has plans to

signing and closing due to external events, then the court must take those changes into account.[26]

Finally, the statutory requirement to "consider all relevant factors"[27] means that the court can consider

> all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects,

---

replicate those facilities as of the merger date, the value of its expansion plans must be considered in the determining fair value. To hold otherwise would be to subject our appraisal jurisprudence to just ridicule. The dangers for the minority arguably are most present when the controller knows that the firm is on the verge of break-through growth, having gotten the hang of running the first few facilities, and now being well-positioned to replicate its success at additional locations—think McDonald's or Starbucks."); *see Ng v. Heng Sang Realty Corp.*, 2004 WL 885590, at *6 (Del. Ch. Apr. 22, 2004) ("In determining fair value, this court cannot consider speculative future tax liabilities."), *modified*, 2004 WL 1151980 (Del. Ch. Apr. 22, 2004), *aff'd*, 867 A.2d 901 (Del. 2005). Conversely, expansion plans or changes in capital structure that depend on the merger cannot be considered. *See Cede & Co. v. JRC Acq. Corp.*, 2004 WL 286963, at *7 & n.71 (Del.Ch. Feb. 10, 2004) (excluding debt incurred to finance the merger); *Allenson v. Midway Airlines Corp.*, 789 A.2d 572, 585–86 (Del. Ch. 2001) (excluding business concessions conditioned on merger).

[26] *BCIM Strategic Value Master Fund, LP, v. HFF, Inc.*, 2022 WL 304840, at *1 (Del. Ch. Feb. 2, 2022) ("In an appraisal, however, the court must determine the fair value of the Company at the time of closing, and the record evidence supports a finding that the value of the Company increased by the time of closing. Quantifying the magnitude of that change is an admittedly difficult task. Based on changes to the implied market price methodology advocated by JLL's expert, this decision finds that the value of the Company increased between signing and closing by $2.30 per share."); *In re Appraisal of Regal Ent. Gp.*, 2021 WL 1916364, at *1 (Del. Ch. May 13, 2021) ("The appraisal statute obligates the court to determine the fair value of Regal when the Merger closed. The parties agreed that some adjustment was necessary because after signing but before closing, Regal's value increased when the Tax Cuts and Jobs Act . . . reduced the corporate tax rate from 35% to 21%. To reflect that valuation increase, this decision adds $4.37 per share to the value of the deal price minus synergies.").

[27] 8 *Del. C.* § 262(h).

the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered . . . .[28]

Although both the statute itself and this passage make consideration of "all relevant factors" mandatory, every possible factor will not be relevant to every case. Not only that, but the parties to the appraisal proceeding create the record on which the court's fair value determination depends. The appraisal statute states that "the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings."[29] Because the determination of fair value follows a litigated proceeding, "the issues that the court considers and the outcome it reaches depend in large part on the arguments advanced and the evidence presented."[30] "An argument may carry the day in a particular case if counsel advance it skillfully and present persuasive evidence to support it. The same argument may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively."[31] Likewise, the approach that an expert espouses may have met "the

---

[28] *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950).

[29] 8 *Del. C.* § 262(h).

[30] *Stillwater Trial*, 2019 WL 3943851, at *20.

[31] *Merion Cap. L.P. v. Lender Processing Servs., L.P.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016).

approval of this court on prior occasions," but may be rejected in a later case if not presented persuasively or if "the relevant professional community has mined additional data and pondered the reliability of past practice and come, by a healthy weight of reasoned opinion, to believe that a different practice should become the norm."[32]

## B.    Determining Standalone Value

The first step in determining the fair value of the Jacobs Group's shares is to determine the standalone value of the Company as a going concern, using the operative realty at the time of the Merger that the Company would have continued pursuing but for the Merger.

### 1.    The Expert Valuations

Both sides introduced testimony from valuation experts who reached dramatically different valuation conclusions. The Jacobs Group's expert valued the Company at $31.6 million. JX 569 at 21. The KV Fund's expert valued the Company at $4.3 million. JX 568 at 54. Even in an appraisal proceeding, that is a prodigious gap.

#### a.    The Jacobs Group's Expert

The Jacobs Group's expert determined the Company's value using the discounted cash flow methodology.[33] He conducted a generally sound valuation with

---

[32] *Golden Telecom Trial*, 993 A.2d at 517.

[33] The Jacobs Group's expert considered but did not rely on a comparable company approach, which he called the guideline public company method, after

one key flaw: his reliance on projections from the Company's Confidential Information Presentation. *See* JX 569 at 5.

"Without reliable . . . projections, 'any values generated by a DCF analysis are meaningless.'"[34] The projections from the Confidential Information Presentation were overly optimistic for the Company's core business. They showed high revenue growth and increasing margins, resulting in a projected 2024 adjusted EBITDA margin of 10.8% compared to a negative 3.8% adjusted EBITDA margin in 2020. *See* JX 568 at 33; *accord* JX 280 at 38.

The projections from the Confidential Information Presentation also included projections for the not-yet launched Edge and Courseware business lines. *See* JX 280 at 38–40. The projections for those brand-new businesses were too speculative to be reliable.

The projections from the Confidential Information Presentation also could not support a meaningful valuation because the first year of the projection period showed a negative EBITDA of $3,259,959, and the second year showed a negative EBITDA of $596,872. JX 280 at 40; *see also* JX 569 at 28. In the halls of academe where

---

determining that there were a lack of sufficiently comparable public companies. He also considered a comparable acquisitions approach, which he called the mergers and acquisitions method, but failed to find sufficiently comparable transactions. He did not identify any arm's-length transactions in the Company's stock, and he did not believe that an asset valuation would reflect the Company's value as a going concern. JX 569 at 6.

[34] *LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *18 (Del. Ch. June 30, 2015).

economics professors ply their trade, a net-present-value-positive project can always secure funding on the basis of its future cash flows. As a matter of theory, therefore, it is always possible to cross the valley of near-term losses to reach the out-year summits of profitability. In the real world, finding funding is not so easy.

Here, the Company had no ability to fund its existing operations or launch the new business lines. The Company had raised financing from every source it could find. It had even secured venture debt financing. It had no options left.

The Confidential Information Presentation stated that the Company needed $6 million in outside investment to launch the Edge and Courseware business lines, plus $2 million to fund the existing business's operating needs. JX 280 at 9. No one was willing to provide that capital. The DCF valuation that the plaintiffs' expert provided assumed that the Company's plans could be funded. The evidence showed they could not.

The projections from the Confidential Information Presentation were also unreliable because they sought to anticipate the results of brand new businesses that the Company had yet to start. Projecting results for a new business is inherently speculative. "Because of that fact, courts generally reject efforts to prove lost-profits damages for a new business that has no history of making profits. This court has

followed a similar practice in appraisal proceedings by declining to credit projections for a new business without any operating track record."[35]

At trial, the plaintiffs' expert conceded that the Courseware business had not started, but he believed that Edge "had been operational." Ultz Tr. 845. Edge had secured a contract for a single pilot project charging $5,000 in annual service fee. JX 687 at 7; *accord* Kaji Tr. 516. That was it. Edge needed $1.5 million just to get off the ground.

The new business projections that management created are too speculative to use. "They represent [the Company's] hoped-for reality, not its operative reality."[36]

The plaintiffs' DCF analysis had other flaws, but the speculative nature of the projections is sufficient to reject it. The plaintiffs' DCF valuation was not credible.

### b.     The KV Fund's Expert

The KV Fund's expert valued the Company using a discounted cash flow methodology and a comparable public company analysis.[37] He concluded that under the discounted cash flow method, the Company's value was $2.4 million. JX 568 at 54.

---

[35] *See Hyde Park*, 2024 WL 3579932, at *22 (footnote omitted) (collecting authorities).

[36] *Id.* at *22.

[37] The KV Fund's expert attempted to value the Company using the value of the Merger. The Jacobs Group successfully moved for an order striking those parties of his report. Dkt. 122.

The KV Fund's expert started by addressing the Company's inability to sustain itself as a going concern:

> While the Company on average has operated with negative working capital, there are times during the annual business cycle when funds are needed to bridge working capital needs, and, every year, the Company needs to fund these outlays. As a result, Akademos has and must borrow these funds or raise equity capital. Without these additional funds, the Company cannot continue to operate, let alone grow and eventually reach scale, at which point it believes it will be able to fund these cyclical working capital needs from its current operating profits.

*Id.* at 5. During the five years leading up to the valuation date of December 23, 2020, the Company "was almost entirely dependent" on the KV Fund for financing, and it was only with that financing that the Company was able to operate as a going concern. In each year from 2015 through 2020, the Company's auditors included a going-concern qualification on its audited financial statements. *Id.*

The Company's financial statements revealed its condition. Between 2015 and 2020, the Company suffered an operating loss in every year, ranging from −$2.4 million in 2017 to −$1.1 million in 2020. JX 14; JX 243; JX 244; JX 356. Net sales increased from $18.2 million in 2015 to $19.5 million in 2020, reflecting a compound annual growth rate of just 1.4%.[38] *See* JX 14 at 6; JX 356 at 5. As of June 30, 2020, the Company's balance sheet reflected total equity of negative $8.6 million. JX 356 at

---

[38] KV Fund's expert report states that "$19.3 million" was the 2020 net sales number. JX 568 at 16. This was a misquote. The Company's 2020 financial statement has the number as "$19.5 million." JX 356 at 5. KV Fund's misquote nevertheless represents an incidental typographic error, because KV Fund's expert still calculated the correct compounded annual growth rate, 1.4%.

6. Total liabilities were $13.1 million, and current liabilities were $12.5 million, including $6.8 million in short-term debt coming due in September 2020. *Id.* at 4; *see also* JX 568 at 17.

Like the Jacobs Group's expert, the KV Fund's expert valued the Company using a discounted cash flow method. He started with the projections from the Confidential Information Presentation, but he excluded the amounts attributed to the two new lines of business. The Company needed to raise $6 million to fund those businesses, rendering them too speculative to value.[39]

The KV Fund's expert thus only valued the cash flows from the Company's existing business. The projections showed a loss of $1.162 million in 2021, but the KV Fund's expert assumed that could be financed, even though that was "an optimistic assumption given the Company's inability to raise capital from outside parties." *Id.* at 33. He also treated the Company's near-term debt of $5.937 million as an adjustment to equity value, rather than as a near-term obligation that the Company lacked the funds to meet. *See id.* at 47. With those and other favorable assumptions, he concluded that under the discounted cash flow approach, the Company had a value of $2.4 million. *Id.* at 49.

---

[39] The KV Fund's expert report states that "[t]he Emerging Business Offerings assume the successful raise of $8 million in new equity in 2020 to fund these emerging business offerings." JX 568 at 32. The Confidential Information Presentation shows the Company needed $6 million to launch Edge and Courseware and $2 million "to fund operating needs to become cash flow positive." JX 280 at 9. The KV Fund's expert mistakenly combined these two numbers to reach $8 million.

The KV Fund's expert separately prepared a comparable companies analysis using four guideline companies. *Id.* at 49–51. He derived a valuation multiple of 0.69x based on their latest twelve months of revenue and a multiple of 0.55x based on the projected next twelve months of revenue. *Id.* at 52. Applying the latest-twelve-month revenue multiple to the Company's results generated a value of $7.3 million. Using the next-twelve-month multiple generated a value of $4.8 million. He then added a 10% premium to offset the KV Fund's control and the value of cash, resulting in a value of $8.4 million based on latest-twelve-month revenue and $5.7 million based on next-twelve-month revenue. *Id.* at 53. He averaged the two for an implied valuation of $7.1 million.

To reach this valuation conclusion, the KV Fund's expert gave 60% weight to the DCF valuation of $2.4 million and 40% to the comparable company valuation of $7.1 million. That weighing resulted in a valuation of $4.3 million. *Id.* at 54.

## 2. Other Valuation Indicators

The court must consider all relevant factors and should test the soundness of the expert valuation conclusion against corroborative evidence from the record.[40]

---

[40] 8 *Del. C.* § 262(h); *accord Le Beau v. M.G. Bancorporation, Inc.* (*M.G. Bancorporation Trial*), 1998 WL 44993, at \*12 (Del. Ch. Jan. 29, 1998), *aff'd, M.G. Bancorporation*, 737 A.2d at 526; *see Cede & Co. v. Technicolor, Inc. (Technicolor Appraisal III)*, 2003 WL 23700218, at \*4 (noting that a valuation supported by "several independent indicia of value" is more reliable and preferred), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005); *In re Appraisal of Shell Oil Co.*, 607 A.2d 1213, 1220 (Del. 1992) ("When a court is faced with a lack of reliable direct evidence of value, or when doubt exists as to the accuracy of its findings, it is appropriate for the court, as a fact-finder, to test its conclusions against other evidence in the record before it."). The court has tested parties' valuations by looking

### a. Transaction Value

The Delaware Supreme Court has instructed the Court of Chancery to prioritize market evidence when determining value in an appraisal, observing that "[i]n economics, the value of something is what it will fetch in the market. That is true of corporations, just as it is true of gold."[41] The justices have also stated that "[m]arket prices are typically viewed [as] superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares."[42]

But the cases in which the Delaware Supreme Court has called for deferring to the deal price have involved third-party transactions subject to sufficiently competitive and informed market forces. Unsurprisingly, this court has eschewed using market evidence in an appraisal following a controller squeeze-out

---

at various factors. *See, e.g., Highfields Cap., Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 52 (Del. Ch. 2007) (considering market price data); *Cede & Co. v. Technicolor, Inc. (Technicolor I)*, 1990 WL 161084, at *32 (Del. Ch. Oct. 19, 1990) (Allen, C.) (considering the decision of knowledgeable insiders), *rev'd in part on other grounds*, 634 A.2d 345 (Del. 1993); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *19 (Del. Ch. Aug. 19, 2005) (considering views of the analyst community); *Highfields Cap.*, 939 A.2d at 59 (considering a party's contemporaneous decision-making).

[41] *DFC Glob. Corp.*, 172 A.3d at 368–69.

[42] *Id.* at 369–70; *see also In re Tesla Motors, Inc. S'holder Litig.* (*Tesla I*)., 2022 WL 1237185, at *42 (Del. Ch. Apr. 27, 2022) ("Market evidence is a reliable indicator of fair price, however, only when 'the evidence reveals a market value forged in the crucible of objective market reality.'"), *aff'd*, 298 A.3d 667 (Del. 2023).

transaction.[43] But even when not deferring to the deal price as *primus inter pares*, this court has sought to "test the soundness of its valuation conclusion against whatever reliable corroborative evidence the record contains."[44]

In this case, the market evidence tends to undermine the valuation of $31.6 million advanced by the Jacobs Group. First, before the 2020 Process began, management reached out to potential strategic partners. That effort yielded only the offer from Ambassador that valued the Company at $10.36 million, with 25% of the consideration taking the form of Ambassador's illiquid common stock and the other 75% taking the form of a promissory note payable over two years.

Next, the Company hired Parchman Vaughan to run a dual-track process seeking either financing or an M&A deal. During the first phase of that process, management and Parchman Vaughan contacted a total of 101 including two firms—Barnes & Noble and Follett—who previously expressed interest in the Company.

---

[43] *See HBK Master Fund L.P. v. Pivotal Software, Inc.*, 2023 WL 10405169, at *23 (Del. Ch. Aug. 14, 2023) ("Unsurprisingly, no appraisal decision of a Delaware court has given weight to deal price when determining fair value in the context of a controller squeeze-out, which lack the competitive dynamics that render deal price reliable."); *Orchard,* 2012 WL 2923305, at *5 ("Orchard makes some rhetorical hay out of its search for other buyers. But this is an appraisal action, not a fiduciary duty case, and . . . an appraisal must be focused on Orchard's going concern value.").

[44] *M.G. Bancorporation Trial*, 1998 WL 44993, at *12, *aff'd*, 737 A.2d; *see Shell*, 607 A.2d at 1220 ("When a court is faced with a lack of reliable direct evidence of value, or when doubt exists as to the accuracy of its findings, it is appropriate for the court, as a fact-finder, to test its conclusions against other evidence in the record before it."); *Cooper*, 1993 WL 208763, at *10 (same); *Technicolor I*, 1990 WL 161084, at *31 (Del. Ch. Oct. 19, 1990) (using market price "as corroboration of the judgment that [the expert's] valuation is a reasonable estimation").

51

That effort generated no interest in a financing transaction and only one indication of interest in an M&A deal before the initial bid deadline of March 31. The latter was a proposal from eCampus to acquire the Company for $6 million dollars, with 50% of the consideration in cash and no specification as to the other 50%.

Because the results were so disappointing, management and Parchman Vaughan continued the effort and reached out to another nineteen parties. That additional effort yielded three new indications of interest and a revised proposal from eCampus:

- Invictus Global, an investor in distressed companies, submitted a non-binding letter of intent offering $5 million in senior-secured, super-priority debtor-in-possession financing, but only if the Company declared bankruptcy.

- Ames Watson offered $500,000 for a 75% stake in the Company, plus another $500,000 for additional equity.

- eCampus increased its proposal by $1 million to $7 million in total, still with no more than 50% payable in cash and the balance undefined without saying what form of consideration the balance would take.

None of those indications of interest bear any resemblance to the valuation advanced by the Jacobs Group's expert. They are more consistent with the valuation prepared by the KV Fund's expert.

Third, the Merger contemplated a go-shop process during which the KV Fund did not have any matching rights and was obligated to support any transaction that the non-KV Fund directors concluded offered more value to the KV Fund in its capacity as a debtholder. *See* JX 400 at 4–5. Because the Merger would pay off $6 million in debt, any superior proposal had to clear that bar.

52

That comparatively open go-shop could have provided some degree of price validation for the transaction price, but the process had shortcomings. At three weeks, it was comparatively short. And given the Company's small size and risky prospects, the business was not one that would attract attention easily. Nor did Company management and Parchman Vaughan reach out widely during the go-shop. They chose instead to contact the four parties they believed had the most interest: Ambassador, eCampus, Ames Watson, and Red Shelf. None of these parties made a superior offer, and Ames Watson told Parchman Vaughan that if the Company "can get anything close to that price [$12.5 million] they should run to closing." JX 410 at 1.

The plaintiffs argue that the Company should have contacted Barnes & Noble, Follett, and VitalSource. Company management and Parchman Vaughan did contact Barnes & Noble and Follett, but at the outset of the 2020 Process. Neither had any interest in the Company. *See* JX 440 at 4–5. And Kaji and Eastburn testified credibly that the Company ruled out VitalSource because they expected VitalSource to want to acquire the Company through a Section 363 sale in bankruptcy. *See* Eastburn Tr. 382–83; Kaji Tr. 464–65. The defendants proved they had good reasons for not contacting VitalSource.

Last, the plaintiffs argue that Kaji undercut the go-shop process by not telling the Board about a text from RedShelf's CEO floating a $10 million figure or Ambassador's reiteration of its proposal from December 2019. Those were missteps, and Kaji should have disclosed those contacts to the Board so the non-KV Fund

53

directors could decide how to proceed. But the RedShelf CEO's text was little more than a trial balloon, and the Board had previously rejected Ambassador's offer. The plaintiffs argue that Ambassador had been willing to go as high as $18.3 million, but they base that on an initial proposal from mid-2019. Ambassador withdrew that proposal in favor of its $10.3 million proposal in December 2019. JX 213 at 3; *accord* JX 211.

The results the go-shop achieved were inconsistent with the valuation advanced by the Jacobs Group's expert. They are more consistent with the valuation prepared by the KV Fund's expert. Nevertheless, because of the arguable flaws in the go-shop, this decision will not rely on it for market evidence regarding the Company's fair value.

### b.     The 409A Valuation

In September 2019, the Company procured a Rule 409A valuation report that valued the Company at $32.03 million and the common stock at $8.72 per share. JX 179 at 19. The Board unanimously approved the Rule 409A valuation for use in granting equity awards to employees. JX 188 at 3–4. The Jacobs Group points to the Rule 409A report as a reliable valuation indicator.

Federal law mandates that if an issuer wants to avoid generating immediate income for an option recipient, then the exercise price for the option must be equal to or greater than the "fair market value of the stock at the time such option is granted." 26 U.S.C. § 422(b)(4). IRS regulations require that a non-public company determine fair market value of its stock by considering "the company's net worth, prospective

earning power and dividend-paying capacity, and other relevant factors." 26 C.F.R. § 20.2031–2(f)(2). Serious penalties attach when taxpayers make false statements to the IRS.[45]

Those considerations might suggest that Rule 409A valuations would be reliable, but the opposite is true. The firms who prepare Rule 409A valuations generally do not charge much, and the directors who rely on them are often less concerned with their accuracy and more concerned with how employees will react to the valuation. An employee who receives common stock supported by a high Rule 409A valuation may feel like they have received something meaningful.[46]

Given these motivations, Rule 409A valuations warrant a heavy dose of skepticism.[47] It is tempting to hold the defendants to their determination of fair market value, and a case may come where a court will use the Rule 409A valuation for that purpose. In this case, however, the defendants' expert testified credibly the Rule 409A analysis was both stale and unreliable. Clarke Tr. 895–97. It was also an

---

[45] *See* 26 U.S.C. § 6662 (civil penalty for accuracy-related tax underpayment); *id.* § 6663 (civil penalty for fraudulent tax underpayment); *id.* § 6701 (civil penalty for aiding and abetting understatement of tax liability); *id.* § 7201 (criminal penalty for willfully attempting to evade or defeat tax).

[46] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 70 (Del. Ch. 2013) (citing directors' testimony that "they needed to ascribe positive value to the common stock so current and prospective employees would think [their stock] options were worth something").

[47] *See, e.g., id.* at *70 (declining to rely on minutes in which directors determined value of stock for purposes of Rule 409A); *Hyde Park*, 2024 WL 3579932, at *20 (declining to rely on Rule 409A valuation).

outlier, and the Company's efforts during the 2020 Process failed to yield anything resembling the Rule 409A valuation. The valuation also assumed that the Company was not in financial distress and would continue as a going concern, neither of which was true in 2020. Given these factors, the court gives no weight to the 409A valuation.

### c. The VitalSource Transaction and Follett Offer

The Jacobs Group also points to the results of a sale process that the KV Fund ran in 2023, two years after the merger. That process generated an expression of interest from Follett in a deal at $30 million and resulted in a sale of the Company to VitalSource for $20 million. That information constitutes post-valuation date evidence that a court generally will not consider.[48]

## C. Determining The Proportionate Share Of Standalone Value Attributable To The Common Stock

The second step in determining the fair value of the Jacobs Group's shares is to determine the value attributable to those shares as a proportionate interest in the company as a going concern. For a company with a multi-class capital structure, that requires determining how much of the company's going concern value should be allocated to the class of stock being appraised. Once that determination has been made, the court can determine the pro rata share of that value attributable to the shares held by the appraisal class.

---

[48] *In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.* (*Sears*), 309 A.3d 474, 534 (Del. Ch. 2024).

The principal factors affecting the common stock's proportionate interest in the value of the Company are the KV Notes and the Preferred Stock. The Company owed approximately $6 million on the KV Notes, plus another $6 million for the 2x repayment premium. The Company also owed approximately $32 million in accrued dividends and principal associated with the Preferred Stock. The KV Fund argues that the common stock sat behind the KV Notes and underneath the Preferred Stock, the common stock could not have had any value unless and until the Company's value approached $40 million. The KV Fund also argues that because it could veto any transaction that did not allocate consideration first to paying off the KV Notes and the Preferred Stock's liquidation preference, any realistic valuation of the common stock had to consider the priority claims held by those securities.

The *Orchard* decision considered a similar issue.[49] There, as here, a private equity fund held preferred stock that carried a $25 million liquidation preference. The private equity fund cashed out the minority in a going private merger. Although conceding that the merger did not trigger the liquidation preference, the fund made the same argument that the KV Fund now advances: Because its consent was required for any third-party deal, the fund could insist that any acquirer agree to pay its liquidation preference first. Therefore, "no third-party investor or market participate would value Orchard without taking into account [the liquidation preference], and [the fund] would never approve a transaction with a third party in

---

[49] *Orchard*, 2012 WL 2923305.

which it did not receive its liquidation preference."[50] The fund concluded that as a matter of market reality, the liquidation preference had to be deducted from the company's standalone valuation.[51]

While acknowledging that those arguments might well be "grounded in market realities,"[52] then-Chancellor Strine held that they could not survive the Delaware Supreme Court's holding in *Cavalier Oil*,[53] which required that minority shares be valued for appraisal on a pro rata basis, without crediting the controlling stockholder with a control premium or imposing a discount on the minority shares.[54] Thus, although Delaware law gives majority stockholders the right to a control premium,

---

[50] *Id.* at *8.

[51] *Id.* at *1; *accord id.* at *7 ("Faced with the inescapable fact that the Going Private Merger did not trigger the liquidation preference, Orchard also argued that Dimensional's legal rights as a preferred holder and its firm voting control as an overall holder of equity increased the probability of payment of the liquidation preference such that it was near certainty on the Merger date." (internal quotation marks omitted)).

[52] *Id.* at *8.

[53] *Cavalier Oil*, 564 A.2d at 1144; *see id.* at 1145 ("[T]o fail to accord a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.").

[54] *Orchard*, 2012 WL 2923305, at *8. The court also noted that the *Cavalier Oil* approach could reflect the recognition "that appraisal is a risky, time-consuming, and burdensome remedy that involves a stockholder tying up its investment in a legal proceeding for several years and having to bear its own cost of prosecution, without any guarantee to receive any floor percentage of the merger consideration." *Id.* at *8 n.45.

58

*Cavalier Oil* tempers the realistic chance to get one by requiring that the court value the minority shares on a pro rata basis in an appraisal.[55]

Explaining further, Chief Justice Strine observed that "[u]nlike a situation where a preference becomes a put right by contract at a certain date, the liquidation preference here was only triggered by unpredictable events such as a third-party merger, dissolution, or liquidation."[56] He also held that incorporating the liquidation preference would equate to basing standalone value on liquidation value rather than going concern value. He reasoned that a standalone valuation had to consider the rights carried by the preferred stock that affected the company's value as a going concern. In *Orchard*, the preferred stock did not have any set dividend rights; its "only right to share in cash flow distributions made by Orchard while the company was a going concern (i.e., dividends) was on an as-converted basis."[57] The preferred stock therefore received no incremental value for its rights, and Chief Justice Strine

---

[55] *See id.* at *8.

[56] *Id.* at *1 (footnote omitted); *see also id.* at *6 ("The Going Private Merger was not an event triggering the payment of the liquidation preference . . . . [A]s of the date of the Merger, the liquidation preference had not been triggered, and the possibility that any of the triggering events would have occurred at all, much less in what specific time frame, was entirely a matter of speculation." (footnote omitted)).

[57] *Id.* at *1; *see id.* at *3 ("The preferred stock has no set dividend rights, but is entitled to participate in any dividends declared by Orchard on its common stock on an as-converted basis.").

59

allocated the going-concern value of the company as a standalone entity as if the preferred stock had been converted into common stock.[58]

Chief Justice Strine addressed similar issues in the *Shiftan* decision, also while serving as Chancellor. There, however, the preferred stockholders held different rights.[59] The corporation completed the merger giving rise to appraisal rights six months before the certificate of designations conferred on the preferred stockholders a right to put their shares to the corporation in return for their liquidation preference. The court treated that right as a non-speculative obligation to pay out the liquidation preference and took that obligation into account when valuing the corporation as a going concern.[60]

## 1. Taking Into Account The Rights Of The Preferred Stock

The Preferred Stock carries rights that affect the value of the Jacobs Group's shares as a proportioned interest in a going concern. There are three pertinent provisions in the Company's Certificate of Incorporation (the "Charter"): (i) a provision calling for the payment of the Preferred Stock's liquidation preference upon a Deemed Liquidation Events (the "Deemed Liquidation Provision"), (ii) a provision

---

[58] *See id.* at *7 ("[I]n the domain of appraisal governed by the rule of *Cavalier Oil*, the preferred stockholders' share of Orchard's going concern value is equal to the preferred stock's as-converted value, not the liquidation preference payable to it if a speculative event (such as a merger or liquidation) that *Cavalier Oil* categorically excludes from consideration occurs.").

[59] *Shiftan v. Morgan Joseph Hldgs., Inc.*, 57 A.3d 928 (Del. Ch. 2012).

[60] *Id.* at 941–42, 941 n. 37.

granting the Preferred Stock a right of mandatory redemption (the "Mandatory Redemption Provision"), and (iii) a provision calling for accrued dividends (the "Accrued Dividend Provision"). JX 19. Under *Orchard*, the Deemed Liquidation Provision does not affect the allocation of value. Under *Shiftan*, the Mandatory Redemption Provision and the Accrued Dividend Provision do. Because of those provisions, the common stock has no value, even for purposes of allocating the Company's standalone value as a going concern.

### a. The Deemed Liquidation Provision

The first potentially pertinent provision is the Deemed Liquidation Provision. The parties have debated whether the Merger triggered the Deemed Liquidation Provision, but for determining the value of the Jacobs Group's shares as a proportionate interest in a going concern, the answer is immaterial. Under *Orchard*, the Deemed Liquidation Provision does not affect the allocation of value when the court values the Company as a going concern.

Under the Charter, the Preferred Stock becomes entitled to receive its liquidation preference "[i]n the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (including a Deemed Liquidation Event (as defined below))."[61] The Deemed Liquidation Provision defines a Deemed Liquidation Event as follows:

> (a) a merger in which . . . the Corporation is a constituent party . . . ;
> except any such merger involving the Corporation . . . in which the

---

[61] JX 19 art. FOURTH, § B.2.1.

shares of capital stock of the Corporation outstanding immediately prior to such merger continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger, at least a majority, by voting power, of the capital stock of (1) the surviving corporation or (2) if the surviving corporation is a wholly owned subsidiary of another corporation immediately following such merger, the parent corporation of such surviving corporation . . . ; or

(b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation . . . of all or substantially all of the assets of the Corporation and its subsidiaries taken as a whole . . . , except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.[62]

The Charter elsewhere provides that the Company cannot engage in a Deemed Liquidation Event without the written consent of the holders of a majority of the Preferred Stock, voting as a single class and on an as-converted basis.[63]

Relying on these rights, the KV Fund argues that the company's standalone valuation must deduct the liquidation preferences because the Company cannot have

_____

[62] JX 19 art. FOURTH, § B.2.3.1 The quotation above the line simplifies the text in three ways. First, wherever the word "merger" appears, the actual provision uses the phrase "merger or consolidation." Second, wherever the word "surviving corporation" appears, the actual provision uses the phrase "surviving or resulting corporation." Those omissions are not marked with ellipses. Third, the actual text includes language that extends the definition to transactions at the level of a Company subsidiary. Those omissions are marked with ellipses.

[63] JX 19 art. FOURTH, § B.3.3(a). In its original form, the Charter stated that the Company lacked the power to engage in a merger that would constitute a Deemed Liquidation Event unless the merger agreement allocated the consideration consistent with the Preferred Stock's right to its liquidation preference. The Charter also stated that if the Company engaged in a sale of assets, then the Company had to use the proceeds to redeem all of the shares of Preferred Stock in return for their liquidation preference before distributing any remaining amounts to the common stockholders.

engaged in the Merger, or any similar transaction, without KV Fund consenting as the majority Preferred Stockholder.

This is the same argument made in *Orchard*, and it fails for the same reasons. The Deemed Liquidation Provision does not apply when the Company is operating as a going concern. In this case, the Deemed Liquidation Provision only could come into effect because of the Merger. It is therefore a negative component of value "arising from the accomplishment or expectation of the merger,"[64] which the appraisal statute commands this court to exclude.

### b. The Mandatory Redemption Provision

The second potentially pertinent provision is the Mandatory Redemption Provision. Under *Shiftan*, this provision establishes a sufficiently definite obligation to require consideration as a relevant valuation factor. As a consequence of the Mandatory Redemption Provision, the common stock has no value.

The Mandatory Redemption Right authorizes the holders of a majority of the Preferred Stock to demand redemption starting on the third anniversary of the Original Issue Date, defined as the date of issuance of the Series B Preferred.[65] If the requisite majority of the Preferred Stock demands redemption, then the Company must redeem the Preferred Stock in exchange for its redemption price in three annual

---

[64] 8 *Del. C.* § 262(h).

[65] JX 19 art. FOURTH, § B.6.1; *accord id.* art. FOURTH, § B.4.4.1(b).

installments, with the first installment paid not more than sixty days after the notice

of redemption. The Mandatory Redemption Right states that if

> the Corporation does not have sufficient funds legally available to redeem on any Redemption Date all shares of Preferred Stock [entitled] to be redeemed . . . , the Corporation shall redeem a pro rata portion of each holder's redeemable shares . . . out of funds legally available . . . , and shall redeem the remaining shares to have been redeemed as soon as practicable after the Corporation has funds legally available therefor.[66]

The Mandatory Redemption Provision thus creates a binding obligation to redeem

shares as funds that can be used legally for that purpose when they become available,

until the Company has redeemed all shares for which redemption has been granted.

The Original Issue Date was in December 2016. The KV Fund therefore could

exercise the Mandatory Redemption Provision as early as December 2019. Jacobs Tr.

24–25, 115–17. Through the Mandatory Redemption Provision, the KV Fund could

sweep up all of the funds that became legally available for making redemptions. The

common stock would not be able to receive any cash flows until the Company had

fully redeemed the Preferred Stock.

### c.     The Accrued Dividend Provision

A third provision that affects the determination standalone value provides for

accrued dividends on the Series A Preferred, regardless of whether any dividends are

declared. The operative language states:

> From and after the date of the issuance of any shares of [Series A Stock], dividends at the Applicable Dividend Rate per share shall accrue on

---

[66] *Id.* art. FOURTH, § B.6.1.

such shares of Series A Stock . . . (the "Accruing Dividends"). Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative . . . .[67]

For the Series A Preferred, the Applicable Dividend Rate was $1.28 per year. For the Series A-1 Preferred, the Applicable Dividend Rate was $1.60 per year. Under the Charter, the Board could not declare any dividends unless (i) all Accrued Dividends were paid first and (ii) all of the outstanding Preferred Stock participated in the dividend on an as-converted basis.[68]

As with the Mandatory Redemption Provision, the Accrued Dividend Provision affects the ability of the common stock to benefit from cash flows while the Company operates as a going concern. Before the Company can pay any dividends to the common stock, the Company must first satisfy any Accrued Dividends. As long as the dividends remained opposed, the common stock could not receive any value from the Company as a going concern.

## 2. The Contingent Claims Analysis

The KV Fund's expert presented a contingent claims analysis to allocate the Company's equity value across its different securities. This methodology models each class of securities as a call option with a claim on the value of the company. The option's exercise price reflects the value at which that class of securities can claim a share of the value. Since the total value of the firm is equal to the sum of the value of

---

[67] JX 19 art. FOURTH, § B.1.

[68] *Id.*

the securities in its capital structure, option pricing models can be used to allocate a known firm value across the securities in its capital structure. Although *Orchard* and *Shiftan* suggested that any effort to model claims to liquidation preferences or other rights would be speculative, the contingent claims methodology can be used for that purpose and is generally accepted in the financial community, making it suitable for use in an appraisal proceeding.[69]

The KV Fund's expert conducted his contingent claims analysis using a value of $6.56 million that he derived from the deal price. This decision will not use the squeeze-out deal price as a valuation indicator, because his DCF valuation is the more persuasive. The resulting valuation of $2.4 million is below the $6.56 million figure used in the contingent claims analysis. As the $6.56 million figure already yields $0 for common stock, it follows that the common stock has no value under a contingent claims analysis using a valuation of $2.4 million.

### 3. The Fair Value Determination

The KV Fund proved that the fair value of the Jacobs Group's shares at the time of the Merger was zero. The appraisal claim does not generate any recovery for the Jacobs Group.

---

[69] *See* Scott P. Mason & Robert C. Merton, *The Role of Contingent Claims Analysis in Corporate Finance,* in *Recent Advances in Corporate Finance* (Edward I. Altman & Marti G. Subrahmanyam eds. 1985); *See generally Weinberger*, 457 A.2d at 713 (holding that a valuation can be based on any method generally accepted in the financial community).

## III.   THE BREACH OF FIDUCIARY DUTY CLAIM

The Jacobs Group separately contends that the Company's directors (other than Jacobs) breached their fiduciary duties by (i) agreeing to the Merger, (ii) treating the Merger as a Deemed Liquidation Event for purposes of the Preferred Stock's liquidation preference, and (iii) approving the KV Notes. The defendants proved that their conduct was entirely fair, so judgment will be entered in their favor on the breach of fiduciary duty claims.

"A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[70] The first element is easily satisfied. "For over two centuries, American courts have treated corporate directors as fiduciaries. Today, the proposition is axiomatic. . . . For just as long, American courts have treated corporate officers as fiduciaries."[71] The members of the Board were fiduciaries as directors, and Kaji was also a fiduciary as an officer.

The second element is more complex. To determine whether corporate fiduciaries have breached their duties when approving a transaction, Delaware law distinguishes between the standard of conduct and the standard of review.[72] The

---

[70] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010).

[71] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 452 (Del. Ch. 2023) (footnotes omitted).

[72] *Id.* at 453.

standard of conduct describes what corporate fiduciaries are expected to do and is defined by the content of the duties of loyalty and care.[73]

When litigation arises, a court does not judge corporate fiduciaries by the standard of conduct but rather by using a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[74] The parties agree that the entire fairness standard of review applies to this case.

The entire fairness standard has two dimensions: substantive fairness (fair price) and procedural fairness (fair dealing).[75] Though a court may analyze each aspect separately, they are not distinct elements of a two-part test. "All aspects of the issue must be examined as a whole since the question is one of entire fairness."[76]

The substantive dimension of the fairness inquiry tests the transactional result. "[T]he court examines the economic and financial merits of the transaction, taking into account all relevant factors."[77] Thus, in the canonical framing, fair price "relates to the economic and financial considerations of the [transaction], including

---

[73] *Trados*, 73 A.3d at 35–36 (Del. Ch. 2013).

[74] *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 457 (Del. Ch. 2011).

[75] *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del. 1983).

[76] *Id.*

[77] *Sears* 309 A.3d at 520 (citing *Cinemera, Inc. v. Technicolor, Inc. (Technicolor Plenary IV)*, 663 A.2d 1156, 1162–63 (Del. 1995)).

all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[78]

The techniques used to evaluate the fair price dimension of the entire fairness test can parallel the techniques used in an appraisal proceeding, but the two inquiries are not identical. The appraisal statute requires that the court determine a point estimate for fair value measured in dollars and cents using the special valuation standards derived from the statutory language.[79] By contrast, the fair price aspect of the entire fairness test is not itself a remedial calculation; it is a standard of review that the court applies to identify a fiduciary breach.[80] For purposes of determining fairness, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness.[81] That means determining whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[82] This standard recognizes the reality that "[t]he value of a corporation is not

---

[78] *Weinberger,* 457 A.2d at 711.

[79] *ACP Master, Ltd. v. Sprint Corp.,* 2017 WL 3421142, at *18 (Del. Ch. July 21, 2017) (footnotes omitted), *aff'd,* 184 A.3d 1291 (Del. 2018) (TABLE).

[80] *Id.*

[81] *In re Dole Food Co., Inc. S'holder Litig.,* 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015).

[82] *Technicolor Plenary IV*, 663 A.2d at 1143.

a point on a line, but a range of reasonable values."[83] "Applying this standard, a court could conclude that a price fell within a range of fairness that would not support fiduciary liability, and yet the point calculation demanded by the appraisal statute could yield an award in excess of the merger price."[84]

The procedural dimension of the fairness inquiry works in service of the fair price element by examining the process that led to the challenged decision or transaction. Known as "fair dealing," it "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[85] The procedural dimension "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[86]

The two dimensions of the entire fairness test interact. "Fair price can be the predominant consideration in the unitary entire fairness inquiry."[87] But because pricing and valuation are often contestable, the procedural dimension can take on significant importance. "A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is

---

[83] *Technicolor Appraisal III*, 2003 WL 23700218, at *2.

[84] *ACP*, 2017 WL 3421142, at *19.

[85] *Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 430 (Del. 1997).

[86] *Weinberger*, 457 A.2d at 711.

[87] *Dole*, 2015 WL 5052214, at *34.

equally true: process can infect price."[88] A dubious process can call into question a low but nominally fair price. "Factors such as coercion, the misuse of confidential information, secret conflicts, or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved."[89] Where those factors are present, a court may conclude that the transaction is not entirely fair. As a remedy, the court could award a "fairer price" or rescissory damages.[90]

"The range of fairness concept has most salience when the controller has established a process that simulates arm's-length bargaining, supported by appropriate procedural protections."[91] "The range of fairness permits a court to give some degree of deference to fiduciaries who have acted properly; it is not a rigid rule that permits controllers to impose barely fair transactions."[92] The true test of financial fairness is whether "the minority stockholder shall receive the substantial equivalent in value of what he had before."[93]

---

[88] *Reis,* 28 A.3d at 467 (collecting authorities).

[89] *ACP,* 2017 WL 3421142, at *19.

[90] *Id.*

[91] *Reis*, 28 A.3d at 467.

[92] *Id.* at 466.

[93] *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952); *accord Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 956–57 (Del. 1985) (quoting *Sterling* and describing the substantial equivalence test); *Rosenblatt v. Getty Oil Co.*,

Ultimately, fairness is not a technical concept. "No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective."[94] A judgment concerning fairness "will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case."[95]

## A.    Whether The Merger Was Entirely Fair

The Jacobs Group primarily challenges the Merger as a breach of fiduciary duty. The defendants proved that the Merger was entirely fair.

### 1.    Fair Price

In this case, the common stockholders received no consideration in the Merger. Notwithstanding that stark result, the Merger provided the common stockholders with a fair price. Before the Merger, the common stockholders were so far underwater in the capital stack that they had no prospect of receiving value from the Company. The Merger provided the stockholders with the substantial equivalent of what they had before.

Evaluating whether the minority stockholders received the substantial equivalent of what they had before requires accounting for the fact that the KV Fund already controlled the Company. Unlike in an appraisal proceeding, where the going-

493 A.2d 929, 940 (Del. 1985) (quoting *Sterling* and applying the substantial equivalence test); *Trados*, 73 A.3d at 76 (same); *Reis*, 28 A.3d at 462 (same).

[94] *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *8 (Del. Ch. Mar. 21, 1996) (Allen, C.), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

[95] *Technicolor Appraisal III*, 663 A.2d at 1140.

concern standard looks to the value of the corporation without considering issues of control,[96] a claim for breach of fiduciary duty that challenges the fairness of a squeeze-out transaction must account for the implications of control.

The *Mendel v. Carroll*[97] case is instructive. There, the Carroll family controlled Katy Industries, Inc. ("Katy"). The family proposed to acquire all of Katy's unaffiliated shares for $22 each and informed the board that the family was only interested in buying, not selling. The board appointed a special committee, which negotiated with the family and reached agreement on a squeeze-out merger in which the minority stockholders would receive $25.75 per share.

At that point, a third party named Pensler proposed to purchase all of Katy's outstanding shares for at least $27.80 per share. In the face of the higher Pensler offer, the special committee withdrew its support for the Carroll family's merger and negotiated with Pensler. To circumvent the Carroll family's refusal to sell, Pensler asked for an option to purchase a sufficient number of Katy shares at the transaction price to dilute the Carroll family's ownership to approximately forty percent. Not surprisingly, the Carroll family objected and asserted that issuing the dilutive option would constitute a breach of fiduciary duty. The special committee was willing to issue the option, but only if the committee's Delaware counsel could opine that the issuance was legal. When Delaware counsel declined to render the opinion, the

---

[96] *E.g.*, *Cavalier Oil*, 564 A.2d at 1144.

[97] 651 A.3d 297 (Del. Ch. 1994).

Pensler deal fell apart.

A stockholder plaintiff filed suit and sought a mandatory injunction requiring the Katy board to issue the option. Citing *Revlon*, the plaintiff argued that the board breached its fiduciary duties by not issuing the option because the third-party deal constituted the best transaction reasonably available.

Chancellor Allen declined to issue the injunction. He first held that *Revlon* did not apply, but he agreed that the "obligation the board faces is rather similar to the obligation that the board assumes when it bears what have been called '*Revlon* duties.'" *Id.* at 306. That was because

> *if* the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization. The directors are obliged in such a situation to try, within their fiduciary obligation, to maximize the current value of the minority shares.[98]

For Chancellor Allen, the critical legal issue was whether the directors' authority included the ability to facilitate a third-party transaction by diluting a control block.

On that issue, Chancellor Allen agreed that a board could dilute a majority holder. As he had in three prior decisions, Chancellor Allen explained that incumbent directors could not dilute an existing block holder for the purpose of preserving their own positions, but they could permissibly dilute a dominant block if they acted "in good faith and on the reasonable belief that a controlling shareholder is abusing its

---

[98] *Id.* (emphasis in original).

power and is exploiting or threatening to exploit the vulnerability of minority

shareholders."[99] Under this framework, if the Carroll family's refusal to sell their

shares could be deemed an abuse of power or exploitive of the minority, then the board

could have authorized the dilutive option. By the same token, a court would have the

ability to issue mandatory injunctive relief on an appropriate factual record.

On the facts, however, Chancellor Allen concluded that the Carroll family's

proposal and their refusal to support the Pensler offer did not present the type of

"threat of exploitation or even unfairness towards a vulnerable minority that might

arguably justify discrimination against a controlling block."[100] He began by

explaining why the two offers were not directly comparable, such that the Carroll

family's refusal to support Pensler's numerically higher offer could not by itself give

rise to an inference of exploitation or unfairness:

> Plaintiffs see in the Carroll Group's unwillingness to sell at $27.80 or to
> buy at that price, a denial of plaintiffs' ability to realize such a price, and
> see this as exploitation or breach of duty. This view implicitly regards
> the $27.80 per share price and the Carroll Family Merger price of $25.75
> as comparable sorts of things. But they are legally and financially quite
> different. *It is, for example, quite possible that the Carroll $25.75 price
> may have been fair, even generous, while the $27.80 Pensler price may be*

---

[99] *Id.* at 304. The earlier cases in which Chancellor Allen had expressed similar views were *Blasius Indus. Inc. v. Atlas Corp.*, 564 A.2d 651, 662 n.5 (Del. Ch. 1988), *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *8 (Del. Ch. Oct. 16, 1987), and *Philips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del. Ch. Aug. 27, 1987). Chancellor Allen drew support for the underlying premise that a board could deploy corporate power to address a threat posed by an existing stockholder from *Unocal*, 493 A.2d 946.

[100] *Mendel*, 651 A.2d at 304.

*inadequate.* If one understands why this is so, one will understand one reason why the injunction now sought cannot be granted.

The fundamental difference between these two possible transactions arises from the fact that the Carroll Family already in fact had a committed block of controlling stock. Financial markets in widely traded corporate stock accord a premium to a block of stock that can assure corporate control. Analysts differ as to the source of any such premium but not on its existence. Optimists see the control premium as a reflection of the efficiency enhancing changes that the buyer of control is planning on making to the organization. Others tend to see it, at least sometimes, as the price that a prospective wrongdoer is willing to pay in order to put himself in the position to exploit vulnerable others, or simply as a function of a downward sloping demand curve demonstrating investors' heterogeneous beliefs about the subject stock's value. In all events, it is widely understood that buyers of corporate control will be required to pay a premium above the market price for the company's traded securities.

The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium.

The significant fact is that in the Carroll Family Merger, the buyers were not buying corporate control. With either 48% or 52% of the outstanding stock they already had it. Therefore, in evaluating the fairness of the Carroll proposal, the Special Committee and its financial advisors were in a distinctly different position than would be a seller in a transaction in which corporate control was to pass.

The Pensler offer, of course, was fundamentally different. It was an offer, in effect, to the controlling shareholder to purchase corporate control, and to all public shareholders, to purchase the remaining part of the company's shares, all at a single price. It distributed the control premium evenly over all shares. Because the Pensler proposed $27.80 price was a price that contemplated not simply the purchase of non-controlling stock, as did the Carroll Family Merger, but complete control over the corporation, it was not fairly comparable to the per-share price proposed by the Carroll Group.[101]

---

[101] *Id.* at 304–05 (citations and footnotes omitted).

The fact that the Pensler offer was nominally higher than the Carroll Family offer thus did not, by itself, support a claim for relief.

But the difference between the offers also did not end the analysis. As Chancellor Allen explained, "[t]o note that these proposals are fundamentally different does not, of course, mean that the board owes fiduciary duties in one instance but not in the other."[102] Instead, the directors were "obligated to take note of the circumstance that the proposal was being advanced by a group of shareholders that constituted approximately 50% of all share ownership."[103] In that circumstance, "the board's duty was to respect the rights of the Carroll Family, while assuring that if any transaction of the type proposed was to be accomplished, it would be accomplished only on terms that were fair to the public shareholders and represented the best available terms from their point of view."[104] The rights of the Carroll family included the right not to sell their shares.[105]

---

[102] *Id.* at 305.

[103] *Id.* at 305–06.

[104] *Id.*

[105] *Mendel*, 651 A.2d at 306 ("No part of their fiduciary duty as controlling shareholders requires them to sell their interest."); *accord Bershad v. Curtis-Wright Corp.*, 535 A.2d 840, 844–45 (Del. 1987); *In re MFW S'holders Litig.*, 67 A.3d 496, 508; *see Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Allen, C.) ("While the law requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority

> The board's fiduciary obligation to the corporation and its shareholders, in this setting, requires it to be a protective guardian of the rightful interest of the public shareholders. But while that obligation may authorize the board to take extraordinary steps to protect the minority from plain overreaching, it does not authorize the board to deploy corporate power *against* the majority stockholders, in the absence of a threatened serious breach of fiduciary duty by the controlling stock.[106]

Chancellor Allen found no indication that the Carroll family's proposal of $25.75 per share was an inadequate or unfair price for the non-controlling stock, nor could he infer that the Carroll family had abused its control by proposing the transaction or refusing to sell.

I applied *Mendel*'s teachings in the *Books-A-Million* case.[107] There, the Anderson family controlled Books-A-Million, Inc. and effectuated a squeeze-out merger in which the minority stockholders received $3.25 per share. The Anderson family had announced it was only a buyer, not a seller, and conditioned the transaction on the twin *MFW* protections.[108] The plaintiffs argued that *MFW* did not apply because the special committee had acted in bad faith by not seeking to sell

---

shareholders."); *see also In re Trans World Airlines, Inc. S'holders Litig.*, 1988 WL 111271 (Del. Ch. Oct. 21, 1988) ("[A] controlling shareholder who bears fiduciary obligations . . . also has rights that may not be ignored . . . includ[ing] a right to effectuate a [squeeze-out] so long as the terms are intrinsically fair . . . . to the minority considering all relevant circumstances."), *abrogated on other grounds by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994).

[106] *Mendel*, 651 A.2d at 306.

[107] *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (ORDER).

[108] *Id.* at *3.

Books-A-Million to a third party, noting that one year earlier, a third party had offered to buy all of the company's outstanding shares for $4.15 per share.[109]

Guided by *Mendel*, I rejected that argument as a matter of law and dismissed the complaint, holding that the Anderson Family did not breach its duties by refusing to sell its shares to third party, then subsequently proposing a going-private transaction at a substantial premium to the market price that nevertheless was less than what a third party might pay for the firm as a whole.[110] The plaintiffs argued that the court could not assume that the third-party offer incorporated a control premium, but that argument was contrary to (i) Delaware decisions recognizing that third-party offers typically include a control premium,[111] (ii) Delaware decisions recognizing that minority shares customarily trade at a discount when a dominant or controlling stockholder is present,[112] and (iii) scholars who have documented those

---

[109] *Id.*

[110] *Id.* at *16.

[111] *See, e.g., Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994) ("The acquisition of majority status and the consequent privilege of exerting the powers of majority ownership come at a price. That price is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power."); *Cheff v. Mathes*, 199 A.2d 548, 555 (Del. 1964) ("[I]t is elementary that a holder of a substantial number of shares would expect to receive the control premium as part of his selling price . . . ."); *In re Marriott Hotel Props. II Ltd. P'ship Unitholders Litig.*, 1996 WL 342040, at *5 (Del. Ch. June 12, 1996) ("[T]he right to direct the management of the firm's assets . . . gives rise to the phenomena of control premia.").

[112] *See, e.g., ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 912 (Del. Ch. 1999) ("[B]ecause the market ascribed a control premium to the privately-held majority ownership, it similarly ascribed a minority share discount to the publicly-traded

propositions[113] and noted that the premiums and discounts vary across legal systems

---

shares . . . ."); *Robotti & Co., LLC v. Gulfport Energy Corp.*, 2007 WL 2019796, at \*2 (Del. Ch. July 3, 2007) ("References to trading price may not be especially useful . . . in this instance, because the trading . . . was limited and [the company] had a control shareholder."); *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at \*8 (Del. Ch. Aug. 19, 2005) (pointing out that in the appraisal context, "the fair value standard itself is, in many respects, a pro-petitioner standard that takes into account that many transactions giving rise to appraisal involve mergers effected by controlling stockholders. The elimination of minority discounts, for example, represents a deviation from the fair market value of minority shares as a real world matter in order to give the minority a pro rata share of the entire firm's value—their proportionate share of the company valued as a going concern."); *Klang v. Smith's Food & Drug Ctrs., Inc.*, 1997 WL 257463, at \*11 (Del. Ch. May 13, 1997) (recognizing that "factors that tend to minimize or discount [a] premium [include] the fact that the . . . stock price contain[s] a minority trading discount as a result of [a party's] control" of a company); *MacLane Gas Co. Ltd., P'ship v. Enserch Corp.*, 1992 WL 368614, at \*9 (Del. Ch. Dec. 11, 1992) (finding that the "the stock market price . . . was not a reliable indication of the value of the [shares of the company at issue because] . . . the trading price contained an implicit minority discount as a result of [the defendant's] control over [the company]."); *see also Goemaat v. Goemaat*, 1993 WL 339306, at \*6 (Del. Fam. May 19, 1993) (applying a minority discount to wife's 11% ownership in a private family business in a divorce proceeding because wife's sister controlled and owned 60% of the business).

[113] *Compare* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L. Rev. 1251, 1273–74 (1999) ("Whether measured against very small blocks that trade on the public stock markets daily or against larger but noncontrol share blocks, control shares command premium prices."), *with* James H. Eggart, *Replacing the Sword with A Scalpel: The Case for A Bright-Line Rule Disallowing the Application of Lack of Marketability Discounts in Shareholder Oppression Cases*, 44 Ariz. L. Rev. 213, 220 (2002) ("A minority discount accounts for the fact that a minority interest, because it lacks the power to dictate corporate management and policies, is worth less to third-party purchasers than a controlling interest."). *See also* Matthew D. Cain, Jill E. Fisch, Sean J. Griffith & Steven Davidoff Solomon, *How Corporate Governance is Made: The Case of the Golden Leash*, 164 U. Pa. L. Rev. 649, 657 (2016) ("[P]ublicly traded shares of firms with a controlling shareholder trade at a so-called 'minority discount.' Because minority shares in a controlled corporation lack the ability to influence the management of the firm, they trade at a discount relative to other shares.") (footnotes omitted); Ronald J. Gilson & Jeffrey N. Gordon, *Controlling Controlling Shareholders*, 152 U. Pa. L. Rev. 785, 787 (2003) ("[T]he controlling shareholder

depending on the extent of the protections that a particular legal system provides to minority stockholders.[114] I explained that while it was not possible to infer the exact amount of the premium or discount because the third party's higher offer potentially included synergies, a comparison between that offer and the Anderson family offer implied a control premium (or concomitant discount) of approximately 30%—within a rational range of discounts and premiums.[115] The price difference was therefore not

---

secures value from its control position that is not received by the non-controlling shareholders. In turn, the controlling shareholder can extract the same value from control by selling it at a premium to the value of the non-controlling shares.").

[114] *See, e.g.*, Alexander Dyck & Luigi Zingales, *Control Premiums and the Effectiveness of Corporate Governance Systems*, 16 J. Applied Corp. Fin. 51 (2004); Alexander Dyck & Luigi Zingales, *Private Benefits of Control: An International Comparison*, 59 J. Fin. 537 (2004); Rafael La Porta, Florencio Lopez-de-Silanes, Andrei Shleifer, Robert Vishny, *Investor Protection and Corporate Governance*, 58 J. Fin. Econ. 3 (2000); Luigi Zingales, *The Value of the Voting Right: A Study of the Milan Stock Exchange Experience*, 7 Rev. Fin. Stud. 125 (1994); Michael J. Barclay & Clifford G. Holderness, *Private Benefits from Control of Public Corporations*, 25 J. Fin. Econ. 371 (1989). Other factors can affect control premiums, including "an independent and widely circulating press, high rates of tax compliance, and a high degree of product market competition." Dyck & Zingales, *Control Premiums*, supra, at 53.

[115] *See, e.g., Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at *9 n.3 (Del. Ch. Dec. 4, 2015) ("[A] number of studies have found that control premia in mergers and acquisitions typically range between 30 and 50%.") (first citing FactSet Mergerstat, *Control Premium Study 1st Quarter 2012*, at 2 (2012); then citing Jens Kengelbach & Alexander Roos, The Boston Consulting Group, *Riding the Next Wave in M & A: Where Are the Opportunities to Create Value?* 10 (2011)); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 819 (Del. Ch. 2011) (applying a "conservative" control premium of 23.4%, which was the "median premium for merger transactions in 2004 calculated by Mergerstat . . . ."), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012); *Prescott Gp. Small Cap, L.P. v. Coleman Co., Inc.*, 2004 WL 2059515, at *4, *13 n.77 (Del. Ch. Sept. 8, 2004) (accepting as "consistent with Delaware law" a control premium valuation range of "30 to 40 percent"); *Agranoff v. Miller*, 791 A.2d 880, 900 (Del. Ch.

so facially large as to suggest that the special committee was acting in bad faith by attempting to facilitate a sweetheart deal for the Anderson family.[116]

For purposes of this case, the fair price dimension of the entire fairness test must account for the reality of the KV Fund's control. That control meant that the KV Fund could veto any transaction that did not first satisfy the $6 million due on the KV Notes, then pay the $6 million repayment premium due on the KV Notes, and then attribute value to the Preferred Stock's liquidation preference of $32 million. Even setting aside the $6 million repayment premium, the common stockholders could not receive any value in a transaction priced below $40 million.

---

2001) (applying a 30% discount to a comparable companies analysis to adjust for an implicit minority discount, noting that the discount in the relevant market sector "tended to be lower on average than that for the entire marketplace") (Strine, V.C.); *Kleinwort Benson Ltd. v. Silgan Corp.*, 1995 WL 376911, at *4 (Del. Ch. June 15, 1995) (citing available premium data ranging from 34%–48%); *see also* Coates, *supra*, at 1274 n.72 (citing data for the period from 1981 through 1994, indicating that "prices paid in acquisitions by negotiated purchase or tender offer of control shares in public companies exceeded the market prices for the targets' outstanding stock by an average of approximately 38%" and that during the same period, "average prices paid in the same types of acquisitions of large (>10%) but noncontrolling blocks of shares in public companies also exceeded market prices for the targets' outstanding stock, but premiums for these noncontrol share blocks averaged only 34.5%"); Gary Fodor & Edward Mazza, *Business Valuation Fundamentals for Planners*, 5 J. Fin. Plan. 170, 177 (1992) (stating that control premiums paid for public companies averaged 30% to 40% from the late 1960s to the late 1980s); *see also* Rebecca Hollander-Bumoff & Matthew T. Bodie, *The Market as Negotiation*, 96 Notre Dame L. Rev. 1257, 1312 (2021) (arguing that "the market for corporate control has significantly high negotiation variance when it comes to the actual assessment of the corporation's control premium.").

[116] *Books-A-Million*, 2016 WL 5874974, at *16.

This decision has determined that the going concern value of the Company was $2.4 million. At that valuation, the KV Fund could demand that the entire amount that any third party paid be allocated to the amounts due on the KV Notes. That outcome would not change even if a third party might pay a control premium of 100%. The common stock would not receive any value until the merger consideration exceeded $40 million, and that type of valuation for the Company is impossible to credit.

The reality of the KV Fund's control also demonstrates why the few third-party bids that the Company received did not offer superior value. eCampus submitted an indication of interest in acquiring the Company for $6 million, with 50% cash and 50% stock. Invictus proposed $5 million in senior-secured, super-priority debtor-in-possession financing for an anticipated bankruptcy. Ames Watson proposed $500,000 for a 75% interest in the Company, plus a commitment to fund the Company's losses going forward.

The Merger also contemplated a go-shop period during which the KV Fund was committed contractually to support any offer that would pay off the KV notes. Parchman Vaughn re-engaged with the four parties who had previously shown the strongest interest in a transaction: eCampus, Ambassador, Ames Watson, and Red Shelf. No one made a superior offer. Redshelf's CEO sent a text message to Kaji indicating that they would consider a deal in the range of $10 million. Lawrence Berger, co-founder and Partner at Ames Watson, responded that "[i]f they can get anything close to [the $12.5 million] they should run to closing." JX 410.

The most attractive third-party indication came from Ambassador, which suggested it might proceed with a transaction with a notional value of between $5,400,000 and $17,2000,000, depending on the assumptions. The deal structure with Ambassador that provided the most cash valued the Company at $10.4 million, with 75% paid in cash over a two-year basis and the remaining 25% in Ambassador equity. That deal thus offered $2 million less than the Merger.

Each of these third-party transactions would have triggered the Preferred Stock's liquidation preference. The common stock would have been out of the money in every one of them. And each of these transactions would have resulted in a change of control. Therefore, like the Pensler transaction in *Mendel* and the third-party inquiry in *Books-A-Million*, the proposals were not comparable to the Merger. If anything, a third party would have needed to pay significantly more than the $12.5 million contemplated by the Merger to compensate the KV Fund for giving up control. No one did.

The common stock thus had no value before the Merger. The common stockholders received nothing in the Merger, but that was the substantial equivalent of what they had before. The Merger therefore offered a fair price.

### 2. Fair Dealing

The entire fairness test also contemplates an inquiry into the procedural aspects of the transaction or decision under challenge. As discussed previously, a strong record of fair dealing can bolster the reliability of the price. Conversely, a weak record on fair dealing can undercut the reliability of the price. Here, the fair price

evidence is sufficiently strong to carry the day without any inquiry into fair dealing. Even if the KV Fund had implemented the Merger unilaterally, without any process whatsoever, the defendants proved that the common stock was so far out of the money that the Merger was entirely fair.

### 3.     The Unitary Determination of Fairness

Taking the evidence as a whole, the defendants proved the Merger was entirely fair. The Company did not have a reasonable prospect of generating value for the common stockholders by operating as a going concern. To the contrary, the Company could neither fund its own operations and nor raise capital from outside investors. Over the course of twenty years, the Company had never turned a profit. In light of this reality, "the directors breached no duty to the common stock by agreeing to a Merger in which the common stock received nothing. The common stock had no economic value before the Merger, and the common stockholders received in the Merger the substantial equivalent in value of what they had before."[117]

## B.     The Challenge To Treating The Merger As A Deemed Liquidation Event

In a related attack on the Merger, the Jacobs Group contends that the director defendants breached their fiduciary duties by treating the Merger as a Deemed Liquidation Event. According to the Jacobs Group, because the Merger was not a Deemed Liquidation Event, the Company should have distributed the $12.5 million

---

[117] *Trados*, 73 A.3d at 78.

in consideration without regard to the Preferred Stock's liquidation preference. The Jacobs Group contends that in that scenario, the common stockholders would have received value.

### 1.      Whether The Merger Constituted A Deemed Liquidation Event

The first question is whether the Merger qualified as Deemed Liquidation Event. If it did, then the Jacobs Group's argument fails on its own terms.

The definition of Deemed Liquidation Event appears in the Charter. "A certificate of incorporation is a contract among the stockholders of the corporation to which the standard rules of contract interpretation apply."[118] "Contracts are to be interpreted as written, and effect must be given to their clear and unambiguous terms."[119]

Article 2.1 of the Charter provided as follows:

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (including a Deemed Liquidation Event . . . the holders of shares of Preferred Stock then outstanding shall be entitled to be paid, on a *pari passu* basis, out of the assets of the Corporation for available for distribution to its stockholders before aby payment shall be made to the holders of Common Stock by reason of their ownership thereof . . . .[120]

The Charter later defines a Deemed Liquidation Event to include a merger or consolidation in which

---

[118] *Shiftan*, 57 A.3d at 934.

[119] *Id.* at 934–35 (cleaned up).

[120] Charter § 2.1.

(i) the Corporation is a constituent party or

(ii) a subsidiary of the Corporation is a constituent party and the Corporation issues shares of its capital stock pursuant to such merger or consolidation;

except any such merger or consolidation involving the Corporation or a subsidiary in which the shares of capital stock of the Corporation outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting corporation or (2) if the surviving corporation is a wholly owned subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation . . . .[121]

The definition of a Deemed Liquidation Event thus consists of a two-part definition with an exception. The definition states in pertinent part that "a merger or consolidation in which . . . [the Company] is a constituent party" qualifies as Deemed Liquidation Event. The Company was a party to the Merger, satisfying that requirement. But the definition continues with an exception for a transaction where the pre-closing shares of the Company stock "continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger . . ., at least a majority, by voting power, of the capital stock of the (1) surviving corporation . . . or (2) . . . the parent corporation of such surviving or resulting corporation" (the "Exception").

---

[121] *Id.* § 2.3.1(a).

The KV Fund structured the Merger as a reverse triangular merger that falls within the Exception. "In a reverse triangular merger . . . the acquirer creates a subsidiary that merges into the target. The merger subsidiary (and its stock) disappear while the target (and its stock) survive as a subsidiary of the acquirer."[122] Through the Merger, the KV Fund's pre-Merger majority ownership stake in the Company became a 100% post-Merger ownership stake. Consequently, the pre-closing shares of the Company continue to represent at least a majority, by voting power, of the capital stock of the surviving corporation.

The defendants argue that the Exception turns on what happens to the stock, not who owns the stock. They point to the phrase "the shares of capital stock of the Corporation outstanding immediately prior to such merger" and argue that those shares must "continue to represent" or be "converted into or exchanged for" shares constituting a majority stake in the surviving entity. The defendants then argue that all of the pre-closing stock in the Company converted into the right to receive the Merger consideration. The Merger thus cancelled the KV Fund's shares rather than converting or exchanging those shares for stock in the post-Merger entity. Because of that distinction, the defendants say the Exception does not apply.

The defendants' interpretation is overly technical to the point of non-sensical. Read as a whole, the Deemed Liquidation Provision has an obvious purpose: generally

---

[122] *W. Standard, LLC v. Sourcehov Hldgs., Inc.* (*Western Standard*), 2019 WL 3322406, at *6 (Del. Ch. July 24, 2019).

trigger the liquidation preference for purposes of a merger, but not when the merger does not constitute a change of control. In place of that understandable and common sense trigger, the defendants' reading would substitute a manipulable and technical test. Under the defendants' reading, even a third-party acquisition would not trigger the Deemed Liquidation Preference if the merger agreement called for the Company's pre-transaction shares of stock to be cancelled or converted into cash.

The Merger therefore falls within the Exception. The Merger did not automatically trigger the liquidation preference as a Deemed Liquidation Event.

### 2. Did Treating The Merger As A Deemed Liquidation Event Constitute A Breach of Fiduciary Duty?

The Jacobs Group argues that because the Merger was not a Deemed Liquidation Event, the KV Fund and the Company's directors could not agree to allocate merger consideration to the Preferred Stock's liquidation preference. The Jacobs Group contends that the directors breached their duty of loyalty by channeling consideration to the Preferred Stock that it was not contractually entitled to receive.

This is another way of arguing that the Merger was an interested transaction such that the defendants had to prove that its terms were entirely fair. This decision has already held that the terms of the Merger were fair. Because of the voting rights associated with the Preferred Stock, the KV Fund could ensure that no value flowed to the common stock as a going concern or in any transaction unless the consideration first went to returning the KV Fund's capital by paying off the KV Notes and satisfying the liquidation preference. The common stock therefore was not entitled to any value from the Company unless and until those prior claims were satisfied.

89

That was never going to happen. The Company had not generated a profit in twenty years and was headed towards another operating shortfall. Without an additional capital infusion, the Company's next stop was insolvency. The common stock would not receive anything in an insolvency proceeding. The defendants proved it was entirely fair for the common stock to receive nothing in the Merger.

### 3. The Challenge To The KV Notes

In addition to challenging the fairness of the Merger, the Jacobs Group contends that the defendant directors breached their fiduciary duties when agreeing to the KV Notes. The Jacobs Group only devoted two pages of their extensive post-trial briefing to this argument. While it is tempting to treat those challenges as waived, this decision will address the issue.

Purporting to quote Eastburn, the Jacobs Group argues that the KV Fund used the KV Notes to "crush the common." Jacobs Tr. 142. At the pleading stage, the court drew the plaintiff-friendly inference that the KV Fund used the KV Notes—and particularly the repayment premium—to shift value away from the common stockholders. At trial, the defendants proved that the KV Notes were necessary and that on the facts of this case, the repayment premiums were warranted. The defendants thus proved that the KV Notes were entirely fair.

For starters, there is no dispute that when the Board agreed to the KV Notes, the Company needed the capital and had no alternative sources of financing. Either the Company would obtain capital from the KV Fund, or it would become insolvent.

90

The Company's desperate straits, however, did not give the KV Fund the right to impose unfair terms. To the contrary, as the Company's stockholder controller, the KV Fund had to prove that the terms of the KV Notes were entirely fair.

The term in the KV Notes that stands out as supporting an inference of unfairness is the 2x repayment premium. At trial, however, Eastburn testified credibly that, in his experience, the 2x repayment premium was a market term given the Company's distressed status. Eastburn Tr. 310–11. The Jacobs Group offered no contrary evidence, leaving Eastburn's testimony unrebutted.

The terms of the 2018 Note provide additional evidence of fairness. Jacobs voted in favor of the 2018 Note. Jacobs Tr. 128–29. The subsequent notes largely reflected the same terms. The fact that the most skeptical member of the Board and the leader of the plaintiff group voted in favor of a tranche of financing that included the challenged terms undercuts the plaintiffs' position.

The contemporaneous record of the Board's deliberations provides still more evidence of fairness. During a Board meeting on March 26, 2019, Jacobs questioned the process that led to the 2019 Note. In response, management explained that they had contacted thirteen potential sources of funding during a six-week period and only received proposals from Concise Capital and Avidbank, the Company's existing lender. Neither proposal was actionable. The Concise Capital proposal required Avidbank to subordinate its loans, which Avidbank would not do. The Avidbank proposal required that the KV Fund place cash collateral in escrow, which the KV Fund would not do. The Company's inability to secure funding from other sources on

the strength of its own balance sheet and financial performance suggests that the terms of the 2019 Note were fair.

A similar series of events led to the 2020 Note. The Company was projecting a cash shortage of $2 million in April 2020 and hoped to fund that gap with new outside capital. Parchman Vaughn sought out capital, but no one was willing to provide it. When that effort failed, the Company turned to the KV Fund and agreed to the 2020 Note.

The evidence at trial also disproved the plaintiffs' claim that the KV Fund affirmatively sought to "crush the common." The KV Fund wanted the Company to succeed and would have happily supported an outside investment. The KV Fund provided bridge financing through the KV Notes because the Company had no other alternatives. Although the court credits that Eastburn said the additional financing would crush the common, that was simply the reality of the preferences that new money would demand.

On the facts of this case, therefore, the defendants proved that the 2x repayment premium was entirely fair. On a different record, or with the benefit of expert testimony, a court could reach a different conclusion. But not in this case.

## C. Aiding And Abetting

The plaintiffs sought to prove that the KV Fund aided and abetted breaches of fiduciary duty by the director defendants. Because the director defendants did not breach their fiduciary duties, the aiding and abetting claim fails.

## IV.  CONCLUSION

The KV Fund proved that the fair value of the common stock for purposes of appraisal was zero. The defendants proved that the Merger and the KV Notes were entirely fair and that the KV Fund did not aid and abet any breaches of fiduciary duty.

The parties will submit a form of order designed to bring this case to a close at the trial court level. If there are additional issues the court must address, the parties will submit a joint letter identifying those issues and proposing a path for resolving them.